IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BREUNERS HOME FURNISHINGS | ) | Case No. 04-12030 (___) |
| CORP. et al.,[1] | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

## AFFIDAVIT OF G. JOSEPH REDDINGTON IN SUPPORT OF FIRST DAY MOTIONS

I, G. Joseph Reddington, swear as follows:

1.     I am the Chairman of the Board of Directors and Chief Executive Officer of each of Breuners Home Furnishings Corporation, Huffman Koos Inc., and Huffman Koos Real Estate Inc., the debtors and debtors in possession herein (collectively, the "Debtors"). I am familiar with the day-to-day operations, business affairs, and books and records of the Debtors. The statements herein are made of my own person knowledge, except as otherwise specified herein.

2.     On July 14, 2004, each of the Debtors commenced a case under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware.

3.     In order to enable the Debtors to minimize the adverse effects of the commencement of their Chapter 11 cases on their businesses, the Debtors have requested various types of relief in "first-day" applications and motions (collectively, the "First Day Motions"). The First Day Motions seek relief aimed at, among other things, maintaining the Debtors'

---

[1] The Debtors consist of the following entities: Breuners Home Furnishings Corp., Huffman Koos Inc., and Huffman Koos Real Estate Inc.

existing cash management system, sustaining vendor, supplier and customer confidence and bolstering employee morale. All of the First Day Motions are crucial to the success of the Debtors' ability to maximize value from the liquidation of their assets efficiently and economically for the benefit of stakeholders.

4.     I submit this affidavit in support of the First Day Motions. Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion. All facts set forth in this affidavit are based on my personal knowledge, upon information supplied to me by others at the Debtors, upon information supplied to me by counsel and other advisers to the Debtors, upon my review of relevant documents, or upon my opinion based upon my experience and knowledge of the Debtors' operations, financial condition and present liquidity crisis. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this affidavit.

5.     Part I of this affidavit describes the Debtors' business and the circumstances surrounding the commencement of these Chapter 11 cases. Part II sets forth the relevant facts in support of the other First Day Motions filed by the Debtors concurrently herewith.

## PART I

### General Background

### Description of Debtors' Business

6.     Breuners Home Furnishings Corporation ("BHFC" or the "Company"), a Delaware corporation, is one of the largest national furniture retailers focused on the middle- to upper-end segment of the market. BHFC was formed in 1994 by Kidd, Kamm Equity Partners,

L.P. (later Kamm Theodore, a California investment partnership, hereinafter "Kamm Theodore" or the "Founding Shareholders"). For the fiscal year ended January 31, 2004, BHFC generated a net loss of approximately $36 million and had annual sales of $324.4 million. BHFC operates forty-seven (47) retail furniture stores, with approximately 1.9 million square feet of selling space and five (5) warehouses with 758,748 square feet of space. BHFC operates thirty-seven (37) Good's and Huffman Koos stores in Delaware, New Jersey, New York, Pennsylvania and Connecticut and ten (10) stores in the greater San Francisco, California area, under the Breuners brand name. All of BHFC's stores operate from leased locations. BHFC is headquartered in Lancaster, Pennsylvania, and is the 23rd largest furniture retailer in the United States. Prior to its decision to cease operations and liquidate its business in an orderly fashion, BHFC employed 1,287 full time associates and 173 part time associates.

## Corporate/Equity Structure

7.      BHFC is a holding company which owns 100% of the stock of Huffman Koos Inc. ("HKI"). HKI, in turn, owns 100% of Huffman Koos Real Estate Inc. ("HKREI") as well as all the operating assets of the enterprise with the exception of several real property leases held by HKREI.

8.      BHFC has three classes of stock currently outstanding, consisting of one class of common stock and two classes of preferred stock (Series B and D). Apollo Investment Fund III, L.P. and certain of its affiliates (together, the "Current Shareholder") currently own 94% of the common stock of BHFC and 100% of the Series B Preferred Stock. Current and former members of executive management own 100% of the Series D Preferred Stock. The Current Shareholder acquired the majority of its interests in BHFC in 1996 as part of an

investment to fund BHFC's acquisition strategy. In 1996, the Founding Shareholders and the Current Shareholder collectively owned 84% of BHFC's common shares. In 2002, certain preferred shares originally owned by the Current Shareholder were converted into common shares, and in 2003 the Founding Shareholders sold their common shares to the Current Shareholder, resulting in the Current Shareholder's owning 94% of the common stock of BHFC. The remaining 6% of the common stock of BHFC is held by current and former members of management.

9.     BHFC's executive management group is headed by G. Joseph Reddington, Chairman and Chief Executive Officer of each of the Debtors, and Michael E. Brown, Chief Financial Officer of each of the Debtors. The Board of Directors of each of the Debtors consists of Mr. Reddington and Mr. Brown and four representatives of the Current Shareholder.

## Historical Background

10.     The Founding Shareholders targeted furniture retailing as an opportunity for consolidation. BHFC's goal was to grow its business, through acquisitions and comparable store sales increases, to $1 billion of revenue and thereby become a leader in a marketplace populated with smaller, geographically specific, family-run enterprises. At the time, many furniture companies focused on selected segments of the market (e.g., Levitz was focused on the economy-minded consumer, and the now bankrupt Heilig-Meyers was focused on business in more rural locations). BHFC was one of the first companies to pursue the consolidation of the upscale consumer segment.

11.     To that end, BHFC entered the west coast marketplace by acquiring the Arnolds and Breuners furniture chains in 1994. BHFC subsequently entered the east coast

marketplace through the acquisition of Huffman Koos in October 1995 and the acquisition of Good's in June 1996. BHFC also acquired Wayside Furniture in February 1998.

12. Unfortunately, the Arnolds and Breuners divisions failed to perform to expectations and previous management was unable to generate meaningful synergies, which, combined with high financing costs, led to significant losses before 1997. The lower barriers to entry into the upper segment of the market also contributed to BHFC's disappointing financial performance. Accordingly, in 1996, the Company realized a net loss of $17.5 million on sales of $277 million. BHFC's current management team, who had significant experience in running large, multi-divisional businesses were hired in 1997 to turn the business around.

13. BHFC's new management team initially focused on improving profitability, through expense reduction, efficiency improvement and generating higher gross margins by improving merchandise assortment. As a result of their efforts and the improving economy, BHFC's profitability improved significantly. EBITDA increased from $1.6 million in 1997, to $8.8 million in 1998, to $19.5 million in 1999, and to $25.1 million in 2000. BHFC opened two stores in 1999 within the Debtors' Good's Division (in Mays Landing, New Jersey, and Jenkintown, Pennsylvania), in addition to one new store in 2001, located in Woodbridge, New Jersey, for the Huffman Koos Division.

### Factors Leading to and Circumstances Related to the Commencement of the Debtors' Bankruptcy Cases

14. By 2001, the majority of the Company's restructuring and consolidation programs were implemented, including the May 2001 closing of the unprofitable $17 million Arnolds Division in San Diego, California. BHFC's sales dropped 9.4% for 2001 to $382.1

million. In addition, BHFC's largest supplier, Thomasville, discontinued shipments as it decided to pursue its own dedicated store strategy, resulting in a narrowing of BHFC's gross margins and creating significant disruption.

15.     In 2002, BHFC faced increased competition from both Raymour & Flanigan (which opened six (6) new stores in BHFC's markets), and Thomasville (which opened eight (8) new stores in BHFC's markets). Based on capital constraints created by BHFC's high debt load, BHFC did not open any new stores in 2002. BHFC's revenue for 2002 decreased 3.0% to $370.7 million. Nevertheless, BHFC's EBITDA increased to $7.4 million as it, among other things, improved its gross margins and reduced expenses.

16.     Revenue continued to decline in 2003 due to intensive competition from Raymour & Flanigan (which opened seven (7) new stores in BHFC markets), and Thomasville (which opened nine (9) new stores in BHFC'S markets). Again, based on capital constraints created by its high debt load, BHFC did not open any new stores in 2003. Revenue for 2003 decreased 12.5% to $324.4 million and EBITDA decreased to $6.0 million.

17.     BHFC's deterioration during this period was not unique in the high-end home furnishings retail sector (though the magnitude for BHFC was worse). The tragic events of September 11, 2001, concerns about the economy and unemployment after the technology stock boom and subsequent decline, in addition to the war in Iraq, all served to cause many consumers to postpone their home furnishings purchase decisions. Additionally, BHFC's inability to address increasing competition by, among other things, opening new store locations or refurbishing existing stores, exacerbated BHFC's problems and financial condition.

## Exploration of Strategic Alternatives

18.     In March 2002, BHFC retained Solomon Smith Barney ("SSB") to explore strategic alternatives and the potential sale of all or part of its separate retail store operations to strategic buyers in an effort to reduce debt or raise additional capital for the Company. During the same period, Jefferies & Co. ("Jefferies") was retained by the Company both to help address the Company's debt load as well as to seek interest from financial investors regarding the acquisition of and/or the investment of equity capital in the Company. Such efforts, however, failed to result in a transaction.

19.     In January 2004, BHFC renewed its efforts to explore strategic alternatives through either a sale or the investment of additional capital in the Company. Jefferies was retained again in the late stages of this process to assist in evaluating alternatives that continued, up until the date on which the Debtors filed their chapter 11 bankruptcy petitions. To date no sale or equity investment has occurred.

## Debt Structure

20.     BHFC's principal secured creditor is a syndicate of lenders consisting of Deutsche Bank Trust Company Americas (52.5%), LaSalle Bank National Association (25%), General Electric Capital Corporation (15%) and Orix Financial Services, Inc. (7.5%) (the "Lender Group"). BHFC and the Lender Group are parties to that certain Second Amended and Restated Credit Agreement (the "Credit Agreement"), dated as of June 26, 2003, which matures on February 1, 2005 (and which has been amended several times since the loan was taken in 1998). HKI and HKREI are guarantors of the loan from the Lender Group. Pursuant to the Credit Agreement, the Lender Group extends revolving credit to BHFC based on a borrowing

base formula (the "Revolving Credit Facility"). The Credit Agreement provides for maximum borrowings of $77.6 million inclusive of outstanding letters of credit. As of July 9, 2004, BHFC had $52.0 million outstanding and $3.9 million in open letters of credit under the Credit Agreement. The Debtors' obligations to the Lender Group are secured by certain (but not all) of the Debtors' assets, including eleven (11) of their real property leases for which the Lender Group recorded leasehold mortgages.

21.     Following the Company's initial borrowing under the Revolving Credit Facility, BHFC also incurred indebtedness under three term loans (respectively, the "Angelo Gordon Term Loan", "Supplemental Term Loan A", and "Supplemental Term Loan B"). BHFC originally obtained the $10 million Angelo Gordon Term Loan from AG Capital Funding Partners, L.P. pursuant to the Revolving Credit Facility in October 2000. BHFC's obligations under the Angelo Gordon Term Loan are secured by a lien in substantially the same assets securing BHFC's obligations to the Lender Group under the Credit Agreement, but is subordinate to the Lender Group's lien under the Credit Agreement. The Angelo Gordon Term Loan is subordinate in payment to the $2.4 million Supplemental Term Loan A (described below), but is prior in payment to the $10 million Supplemental Term Loan B (also described below). The Angelo Gordon Term Loan provides for the accrual of "payment in kind" or "PIK" interest, and for the current payment of certain other interest. The amount due under the Angelo Gordon Term Loan as of July 9, 2004, including accrued but unpaid interest, is approximately $12.14 million, consisting of $10 million in principal, approximately $1.98 million of accrued PIK interest, and approximately $160,000 of interest currently payable.

22.     BHFC obtained Supplemental Term Loans A and B (the "Supplemental Term Loans") in January 2002, from Deutsche Bank Trust Company Americas, the lead lender under the Credit Agreement, in response to a liquidity shortfall and to provide the Company both with working capital and liquidity to enable it potentially to open new stores. Originally, the Supplemental Term Loans were designated as a $12.4 million supplemental credit line ("Supplemental Line") to be drawn upon in the event that BHFC's cash requirements exceeded its ability to borrow under the Revolving Credit Facility terms contained in the Credit Agreement. As part of the amendment and restatement of the Credit Agreement in June 2003, the Supplemental Line was fully drawn, broken into two parts and converted into two term loans with covenants consistent with the overall Credit Agreement. Supplemental Term Loan A is supported by a loan purchase agreement guaranteed by Apollo Investment Fund III, LP and certain of its affiliates. As of July 9, 2004, the outstanding amount due under Supplemental Term Loan A is approximately $2.4 million, and the outstanding amount due under Supplemental Term Loan B is approximately $10 million. The Supplemental Term Loans are secured by the same assets as BHFC's obligations to the Lender Group under the Revolving Credit Facility. The liens securing Supplemental Term Loans are subordinate to the liens securing the Revolving Credit Facility. The Angelo Gordon Term Loan and Supplemental Term Loan B are subordinate in payment to Supplemental Term Loan A. Supplemental Term Loan B is subordinate in payment to both Supplemental Term Loan A, and to the Angelo Gordon Revolving Term Loan.

23.     As previously discussed, the Company retained Jefferies in June 2003 to attempt to refinance the capital structure and provide incremental liquidity to the business. After

receiving several proposals requiring the ongoing participation of the existing lenders, which participation was not obtained, the Lender Group opted instead to extend the maturity of the facility from August 2003 to August 2004.

24.     In April 2004, BHFC again amended and restated its credit agreement to provide for the sale-leaseback of certain assets, and to further extend the maturity of the credit facility to February 2005, in connection with which the company sold two properties for $17 million and used the net proceeds, after letters of credit and fees and expenses, to reduce borrowings under the Revolving Credit Facility.

### Commencement of the Debtors' Bankruptcy Cases

25.     Competition in BHFC's markets intensified at a time when the Company did not have the resources to defend its market share. Thomasville opened 20 new stores from 2001 to 2003 and Raymour & Flanigan opened 17 new stores in BHFC's existing markets in the same period. Moreover, Raymour & Flanigan targeted Good's market share by outspending Good's eight to one in advertising, significantly reducing Good's market share in the Philadelphia metro marketplace. Without new store growth to offset cost increases in operating expenses, property and casualty insurance, workers compensation expenses and medical cost increases, BHFC's business continued to undergo expense increases with no offset through revenue growth. Management's last major restructuring effort made in mid-2002 generated an annual saving of $2.0 million, which approximates only one year of cost increases. The Company's inability to attract equity capital was impacted by the deteriorating business conditions, the inability of the Company to meet its forecast and concerns over borrowing base changes that significantly reduced liquidity.

26.     The Company, with the assistance of its advisors, developed a restructuring plan which included closing certain unprofitable stores and consolidating distribution centers and customer call centers.  On June 28, 2004, the Company presented this restructuring plan to Deutsche Bank who said that it was unwilling to provide the incremental financing required by the plan above the borrowing base.  The Company in addition presented the restructuring plan to Angelo Gordon, who also was not interested in providing the incremental financing.  The Company's financial advisors also had discussions with a number of other potential financing sources regarding the plan and none were firmly interested in providing the financing required.

27.     The convergence of these factors, coupled with the Debtors' inability to stimulate interest in the acquisition of their businesses as a going concern or find parties interested in financing its restructuring plan, compelled each of the Debtors to file voluntary petitions under chapter 11 of the Bankruptcy Code on July 14, 2004.  The Debtors remain in possession of their property and are managing their businesses as debtors in possession.  The Debtors intend to use the chapter 11 process to conduct an orderly liquidation of their businesses for the benefit of all stakeholders.

## PART II

### First Day Motions and Applications

28.     I believe that the ability of the Debtors to maximize value through an orderly liquidation of their assets is dependent, in part, on approval of the Debtors' First Day Motions and Applications submitted concurrently herewith.  The following is the factual background and support for each of these First Day Motions.

## Procedural Motions

### A. Motion For Order Directing Joint Administration Of Chapter 11 Cases

29. The three companies that comprise the Debtors are related entities. As noted above, HRI and HKREI are wholly-owned direct and indirect subsidiaries of BHFC, the parent company. Each of the Debtors share common officers and members of the Board of Directors. The Debtors' businesses are fully integrated and do not operate independent of one another. Many of the matters affecting one of the Debtors will also affect the other Debtors. I am informed by counsel that as a result, the Debtors are "affiliates" within the meaning of section 101(2) of the Bankruptcy Code. I believe that the joint administration of the Debtors' estates is appropriate under Bankruptcy Rule 1015(b) and will ease the burden of these Chapter 11 cases on the Court and parties in interest.

30. I am informed by counsel that the joint administration of the Debtors' Chapter 11 Cases will permit the Clerk of the Court to utilize a single general docket for these cases and combine notices to creditors of the Debtors' respective estates and other parties-in-interest, which will result in savings to the estates.

31. I am further informed by counsel that joint administration of these Chapter 11 Cases will avoid the Debtors' incurring considerable and unnecessary time and expense in connection with, among other things, the Debtors' filing and service of duplicative motions and notices on creditors and other parties-in-interest.

32. I am informed by counsel that joint administration will also enable the parties-in-interest in these Chapter 11 cases to be apprised of the various matters before the Court in all of these Chapter 11 cases.

33.     Accordingly, I believe and submit that the joint administration of these Chapter 11 cases is in the best interests of the Debtors' estates, their creditors and other parties-in-interest.

**B.      Motion For Order Extending Time To File
Schedules and Statements of Financial Affairs**

34.     By this motion, the Debtors seek a 15-day extension of the date by which the Debtors must file their schedules and statement of financial affairs.

35.     Due to the size and complexity of the Debtors' business, the diversity of its operations and assets, and the limited staffing available to gather, process and complete the Schedules, the Debtors will not be able to complete the Schedules by the August 12, 2004 deadline required by Delaware Local Bankruptcy Rule 1007-1(c). At this juncture, the Debtor estimates that an extension of fifteen (15) additional days pursuant to Bankruptcy Rule 1007(c), i.e. until August 27, 2004, will provide the Debtors with sufficient time to prepare and file the Schedules. Accordingly, the Debtors are requesting such an extension, without prejudice to their rights to seek any further extension(s) from this Court, or to seek a waiver of the requirement for filing certain Schedules.

**C.      Application For Order Appointing AlixPartners, LLC As
Claims Agent Of The Bankruptcy Court Pursuant To 28 U.S.C. § 156**

36.     The Debtors have selected AlixPartners, LLC ("Alix") as their notice and claims agent.

37.     The Debtors estimate that there are several thousand creditors, potential creditors, former employees, entities and other parties-in-interest who require notice of various matters and, in particular, the deadline for filing proofs of claim. Upon information and belief,

given the size of the creditor body, it would be highly burdensome for the Debtors to provide notice of the bankruptcy filing and other notices to all creditors, or to docket and maintain effectively the large number of proofs of claim that may be filed in these Chapter 11 cases.

38.     Alix will act as the notice, claims and balloting agent in these Chapter 11 cases. As notice, claims and balloting agent, Alix will maintain the list of the Debtors' creditors. Alix will serve the required notices in these Chapter 11 cases, to the extent requested by the Debtors, and will prepare the related certificate or affidavit of service. Alix also will assist the Debtors, to the extent requested by the Debtors, in the reconciliation of claims and other administrative services as may be required by the Court or the Debtors. Additionally, Alix will receive and docket claims reflecting, in sequential order, the claims filed in these Chapter 11 cases, specifying: (i) the claim number; (ii) the date such claim was received by Alix or the Clerk's Office; (iii) the name and address of the claimant and the agent, if any, that filed such a proof of claim; (iv) the amount of the claim; and (v) the classification(s) of such claim (e.g., secured, unsecured, priority, etc.) according to the proof of claim.

39.     Alix also may provide the Debtors with claims management consulting and computer services. The Debtors also may use Alix to provide the Debtors with training and consulting support necessary to enable the Debtors to effectively manage and reconcile claims, and to provide the requisite notices of the deadlines for filing proofs of claim. In addition, the Debtors may utilize other services offered by Alix, such as: (a) providing other notices that will be required as these Chapter 11 cases progress; (b) assisting in the preparation of the Debtors' schedules and statements of financial affairs; and (c) providing such other administrative services that may be requested by the Debtors.

40. I believe that the most effective and efficient manner by which to provide notice and solicitation in these Chapter 11 cases is to engage Alix to act as notice and claims agent of the Court. I further believe that such assistance will expedite service of notices and streamline the claims administration. I believe that Alix is well-qualified to provide such services, expertise, consultation and assistance, and submit that the ongoing retention of Alix is in the best interest of the Debtors, their estates, their creditors and any other parties-in-interest.

## Professional Retention Applications And Related Motions

**D. Application Pursuant To Federal Rule Of Bankruptcy Procedure 2014(a) For Order Under Section 327(a) Of The Bankruptcy Code Authorizing The Employment And Retention Of Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C. As Bankruptcy Counsel For The Debtors And Debtors In Possession Nunc Pro Tunc to the Petition Date**

41. The Debtors seek to employ and retain the firm of Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C. ("PSZYJ&W" or the "Firm") of Wilmington, Delaware as their bankruptcy counsel with regard to the filing and prosecution of these Chapter 11 cases and all related matters, effective as of the Petition Date.

42. I believe that the representation of the Debtors by PSZYJ&W is critical to the success of the Debtors' bankruptcy proceeding. The Debtors seek to retain PSZYJ&W as their bankruptcy attorneys because of the Firm's extensive experience and knowledge in the field of Debtors' and creditors' rights and the Chapter 11 process, the Firm's expertise, experience and knowledge in practicing before the bankruptcy courts, and the Firm's ability to quickly respond to all issues that may arise in these Chapter 11 cases, including, without limitation, issues related to the Debtors' rights. In preparing for these Chapter 11 cases, PSZYJ&W has become familiar

with the Debtors' businesses and affairs and many of the potential legal issues that may arise in the context of these Chapter 11 cases.

43.     Accordingly, I believe that PSZYJ&W is both well qualified and uniquely able to represent the Debtors in these Chapter 11 cases in an efficient and timely manner. I submit that the ongoing retention of PSZYJ&W is in the best interests of the Debtors, their estates, their creditors and other parties in interest.

**E.     Application Pursuant To Federal Rule Of Bankruptcy Procedure 2014(a) For Order Under Section 327(e) Of The Bankruptcy Code Authorizing The Employment And Retention Of Jenkens & Gilchrist Parker Chapin LLP As Special Counsel For The Debtors And Debtors In Possession Nunc Pro Tunc to the Petition Date**

44.     The Debtors' seek to employ and retain the firm of Jenkins & Gilchrist Parker Chapin LLP ("JGPC" or the "Firm") of New York, New York as their special counsel in the areas of real estate and corporate matters in these Chapter 11 cases, effective as of the Petition Date.

45.     I believe that the representation of the Debtors by JGPC is critical to the success of the Debtors' bankruptcy proceeding. The Debtors seek to retain JGPC as their special counsel because of the Firm's extensive experience and knowledge of the Debtors' legal affairs in the fields in which it will represent the Debtors, the Firm's expertise, experience and knowledge in practicing in those areas, and the Firm's ability to quickly respond to all issues that may arise in the Chapter 11 case in those areas. JGPC has represented the Debtors since 1994, and has become familiar with the Debtors' business and affairs and many of the potential legal issues that may arise in the context of or during the course of these Chapter 11 cases.

46.     Accordingly, I believe that JGPC is both well qualified and uniquely able to represent the Debtors as their special counsel in these Chapter 11 cases in an efficient and timely manner. I submit that the ongoing retention of JGPC is in the best interests of the Debtors, their estates, their creditors and other parties-in-interest.

**F.      Application Pursuant To Federal Rule Of Bankruptcy Procedure 2014(a) For Order Under Section 327(e) Of The Bankruptcy Code Authorizing The Employment And Retention Of Barley Snyder Attorneys at Law As Special Counsel For The Debtors And Debtors In Possession Nunc Pro Tunc to the Petition Date**

47.     The Debtors' seek to employ and retain the firm of Barley Snyder Attorneys at Law ("Barley Snyder" or the "Firm") of Lancaster, Pennsylvania as their special counsel in the areas of labor matters in these Chapter 11 cases, effective as of the Petition Date.

48.     I believe that the representation of the Debtors by Barley Snyder is critical to the success of the Debtors' bankruptcy proceeding. The Debtors seek to retain Barley Snyder as their special counsel because of the Firm's extensive experience and knowledge of the Debtors' legal affairs in the fields in which it will represent the Debtors, the Firm's expertise, experience and knowledge in practicing in those areas, and the Firm's ability to quickly respond to all issues that may arise in the Chapter 11 case in those areas. Barley Snyder has represented the Debtors since 1998, and has become familiar with the Debtors' business and affairs and many of the potential legal issues that may arise in the context of or during the course of these Chapter 11 cases.

49.     Accordingly, I believe that Barley Snyder is both well qualified and uniquely able to represent the Debtors as their special counsel in these Chapter 11 cases in an

efficient and timely manner.  I submit that the ongoing retention of Barley Snyder is in the best interests of the Debtors, their estates, their creditors and other parties-in-interest.

**G.  Application Pursuant To Fed. R. Bankr. P. 2014(a) For Order Under 11 U.S.C. § 327(a) Authorizing The Employment And Retention Of FTI Consulting, Inc. As Financial Restructuring Advisors For The Debtors And Debtors In Possession Nunc Pro Tunc to the Petition Date**

50.  The Debtors seek to employ and retain the firm of FTI Consulting, Inc. ("FTI" or the "Firm") of Saddle Brook, New Jersey as their financial restructuring advisors.

51.  The Debtors seek to retain FTI as their financial restructuring advisors because of the Firm's extensive experience and knowledge representing debtors and other companies in the field of strategic and financial advisory services in large-scale corporate restructuring transactions, and in the analysis, design and formulation of their options in connection with a restructuring, financing and/or sale.  The Firm has the ability to quickly respond to all issues that may arise in these Chapter 11 cases.  FTI has represented the Debtors since May, 2004 and has assisted the Debtors in preparing for these Chapter 11 cases.  In the course of such representation and in preparing for these Chapter 11 cases, FTI has become familiar with the Debtors' businesses and affairs and many of the potential strategic financial issues that may arise in the context of or during the course of these Chapter 11 cases.

52.  Accordingly, I believe that FTI is both well qualified and uniquely able to act as the Debtors' financial advisors in these Chapter 11 cases.  I submit that the ongoing retention of FTI is in the best interest of the Debtors, their estates, their creditors and other parties in interest.

**H.   Debtors' Application to Employ Keen Realty LLC as Special real estate consultants**

53.   The Debtors seek to employ and retain the firm of Keen Realty LLC

("Keen") of Great Neck, New York as their special real estate consultants.

54.   The Debtors seek to retain Keen as their special real estate consultants

because of the Firm's extensive experience and knowledge representing debtors and other

companies in the field of retail real estate and retail lease sales and restructurings.  The Debtors

propose to engage Keen, to among other things, to develop and implement a marketing program

for the sale of the Debtors' retail leases, to communicate with potential replacement tenants,

brokers, landlords, investors and other parties and solicit and negotiate offers from prospective

purchasers and prospective settlements from landlords, and make recommendations to the

Debtors with respect to the advisability of accepting particular purchase offers and settlements.

55.   I believe that Keen is both well qualified and uniquely able to act as the

Debtors' Special real estate consultants in these Chapter 11 cases.  I submit that the ongoing

retention of Keen is in the best interest of the Debtors, their estates, their creditors and other

parties in interest.

**I.   Motion For Administrative Order Under 11 U.S.C. §§ 105 And 331 Establishing
Procedures For Interim Compensation And Reimbursement Of Expenses For
Professionals And Committee Members**

56.   The Debtors request that procedures for compensating and reimbursing

court-approved professionals on a monthly basis be established, comparable to those established

in other similar sized Chapter 11 cases in this District.  As described above, the Debtors are

seeking approval of its employment of PSZYJ&W, as their bankruptcy counsel, JGPC as their

special corporate and real estate counsel, Barley Snyder Attorneys at Law as their special labor counsel and FTI as their restructuring advisors.

57.     The Debtors anticipate that they may also need to retain other professionals in these Chapter 11 cases as the need arises. In addition, an official committee of unsecured creditors may be appointed (the "Committee"). The Committee may also seek to retain various professionals (the "Committee Professionals"). The Debtors' various estate professionals (collectively, the "Estate Professionals") will carry out unique functions and will coordinate with one another to avoid unnecessary duplication of services while obtaining maximum advantage from each firm's expertise and knowledge of the Debtors. I am informed by counsel that entry of an order granting such relief will streamline the professional compensation process and enable the Court and all other parties to more effectively monitor the professional fees incurred in these Chapter 11 cases. Further, it will avoid forcing the professionals to finance these bankruptcy cases while awaiting final approval of their fees and expenses.

58.     Briefly stated, the requested procedures would permit each retained professional, subject to these procedures, to file with the Court and present to the Debtors, the United States Trustee, counsel to the Committee, and certain other interested parties an application for interim approval and allowance of fees for services rendered and expenses incurred by each retained professional during the immediately preceding month.

59.     I therefore submit that an order granting the relief requested in the above mentioned motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest.

## Motions Pertaining To Business Operations

**J.      Motion For Order Under 11 U.S.C. §§ 105, 345, 363, 364, 1107 And 1108 Authorizing (i) Maintenance Of Existing Bank Accounts, (ii) Continued Use Of Existing Business Forms, (iii) Continued Use Of Existing Cash Management System, and (iv) Limited Waiver of Section 345(b) Deposit and Investment Requirements**

### 1.      Maintenance of Existing Bank Accounts.

60.      As previously described, the Debtors operate at many locations in numerous states and municipalities across the country. Such operations are consistent with the Debtors' retail operations in the markets in which they sell their products. The Debtors maintain a number of bank accounts ("Bank Accounts"), currently and in the ordinary course of business, at various geographical locations to facilitate the Debtors' ability to transact their business. These various Bank Accounts are fully integrated into the whole of the Debtors' cash management system.

61.      The Debtors seek a waiver of the United States Trustee's requirement that the Bank Accounts be closed and new postpetition bank accounts be opened. If this requirement is enforced in these Chapter 11 cases, it would cause enormous disruption to the Debtors' businesses and impair their ability to utilize the Chapter 11 process to conduct an orderly liquidation of their assets.

### 2.      Continued Use of Existing Business Forms.

62.      To minimize expense to their estates, the Debtors also request authority to continue to use all correspondence and business forms (including, but not limited to letterhead,

purchase orders, invoices, etc.), as well as checks existing immediately before the Petition Date, without reference to its status as Debtors in possession.[2]

63.     Parties doing business with the Debtors undoubtedly will be aware, as a result of the size of these Chapter 11 cases, of the Debtors' status as Chapter 11 Debtors in possession. Changing correspondence and business forms would be unnecessary and burdensome to the estates, as well as expensive and disruptive to the Debtors' business operations. For this reason, the Debtors request that they be authorized to use their checks and business forms without placing the label "Debtors in possession" on each such check or form.

**3.    Cash Management System.**

64.     The Debtors by this Motion seek authority to continue to use their Cash Management System, as such system may be modified pursuant to the requirements of any Court-approved debtor-in-possession financing facility and related order of this Court.

65.     The Debtors maintain a centralized, integrated cash management system. The Debtors maintains various types of accounts as detailed herein. The flow of funds through the cash management system is illustrated by charts attached to the Motion as Exhibit A and detailed below. The Debtors' Cash Management System can be broken down in three pieces: (i) the collection accounts described below, (ii) the concentration account located at Deutsche Bank Trust Company Americas ("Deutsche Bank") (the "Concentration Account"), and (iii) various bank accounts also described below used to fund the Debtors' controlled disbursement accounts.

a.      The Collection Accounts and the Deutsche Bank Concentration Account. The Debtors' Cash Management System has a simple and logical structure. Funds that are received through the Debtors' operations are all deposited

_____

[2]  After the Debtors' existing supply of checks has been exhausted, the Debtors will use checks marked "DIP."

into one of three collection accounts: (1) Wells Fargo (for Breuners store deposits and credit card receipts for all stores but excluding the Debtors' private label credit card receipts); (2) Fleet Bank (for Huffman Koos store deposits); and (3) First Union/Wachovia (for Goods store deposits) (collectively, the "Collection Accounts"). These funds are received primarily from the Debtors' operations through checks and credit card purchases. The funds in the Collections Accounts are wire transferred each banking day by a standing wire order or a predefined wire transfer order to the Concentration Account. In addition, the Debtors sell their private label credit card receipts on a business daily basis to Household Bank, which remits the purchase amounts directly to the Concentration Account. The Concentration Account funds the Debtors' debt service obligations to the Lender Group under the Debtors' Revolving Credit Facility. Deutsche Bank then readvances the funds from the Concentration Account, pursuant to the Debtors' instructions and to the extent of availability under the Revolving Credit Facility, to the Debtors' various disbursement bank accounts described below. Payment from those disbursement accounts are then used to satisfy the Debtors' payroll obligations and operating expenses.

b.      Disbursement. The Debtors' Cash Management System includes seven different disbursement accounts (collectively, the "Disbursement Accounts") used to pay the Debtors' expenses, each of which ultimately is funded by the readvances, described above, from the Concentration Account: (1) four disbursement accounts at LaSalle Bank, consisting of a top-tier Disbursement Account from which wire transfers are made for freight, rent and other expenses and from which transfers are made to the other three Disbursement Accounts at LaSalle Bank, from which other three LaSalle Disbursement Accounts the Debtors make merchandise payments, expense payments, and customer refund payments, respectively; (2) a single-tier Disbursement Account at Wells Fargo (the "West Coast Payroll Account") from which the Debtors pay their West Coast payroll and from which payments are made to ADP for the Debtors' West Coast payroll tax debits; and (3) two Disbursement Accounts at Fleet Bank, consisting of a top-tier Disbursement Account at Fleet Bank from which payments are made to ADP for Debtors' East Coast payroll tax debits and direct deposit employee payroll obligations, and from which transfers are made to the other Disbursement Account at Fleet Bank, from which second

Disbursement Account at Fleet Bank the Debtors pay their East Coast payroll (the "East Coast Payroll Account," and together with the West Coast Payroll Account, the "Payroll Accounts"). Disbursements from these Disbursement Accounts are made by check, wire transfer or automated clearinghouse transfers. Typically, the amounts paid from the Disbursement Accounts (including payroll) range from $4.2 million to $8.8 million per week, depending on the time of the month and year and the amount of operating expenses that become due at a given time, during each month.

c.      The Debtors' Payroll Accounts. The Debtors' West Coast Payroll Account as stated above is funded from the Concentration Account. Approximately $430,000 on average generally is transferred from the Concentration Account to the West Coast Payroll Account semi-monthly to pay the Debtors' West Coast employees and to fund the related payroll tax obligations. The month-end West Coast payroll is generally larger to accommodate the payment of commissions to the Debtors' sales employees. The Debtors' East Coast Payroll Account as stated above is funded from the top-tier Fleet Bank Disbursement Account. Approximately $700,000 to $850,000 in the aggregate generally is transferred from the Concentration Account to the East Coast Payroll Account and the top-tier Fleet Bank Disbursement Account weekly to pay the Debtors' East Coast employees and to fund the related payroll tax obligations. The Debtors pay employees by direct deposit as well as by live checks that are drawn on the applicable Payroll Account. The payroll amounts for employees who are paid by direct deposit are generally funded to the East Coast Payroll Account two business days prior to the date on which such payroll amounts are actually paid to employees, and to the West Coast Payroll Account one business day prior to the date on which such payroll amounts are actually paid to employees. The payroll amounts for employees who are paid by check are funded when the payroll checks are presented or anticipated to be presented to the applicable Payroll Account. The Debtors' are responsible for generating the information for the proposed payroll distribution and use the information to calculate the Debtors' payroll obligations based on each employee's current wages, including the amounts to be withheld for the employee and the Debtors' tax obligations. The Debtors fund to ADP from the top-tier Fleet Bank Disbursement Account and from the Wells Fargo payroll

account the taxes withheld from each employee as well as the Debtors' portion of taxes payable to the appropriate federal, state and local tax agencies, as set forth above, one business day prior to the date on which payroll amounts are actually paid to employees, and ADP remits those funds to taxing authorities on the due dates on the Debtors' behalf.

66.     Given the size of the Debtors' operations, the Debtors' successful operations in the Chapter 11 proceedings simply cannot be accomplished if there is substantial disruption in the Debtors' cash management procedures. It is essential, therefore, that the Debtors be permitted to continue to consolidate the management of their cash as needed and in the amounts necessary to continue the operation of its businesses.

67.     The basic structure of the cash management system described herein constitutes the Debtors' ordinary, usual and essential business practices. The cash management system is similar to those commonly employed by corporate enterprises comparable to the Debtors' in type, size and complexity. The widespread use of such systems is attributable to the numerous benefits they provide including the ability to (a) control and monitor corporate funds, (b) reduce idle cash, (c) ensure cash availability, and (d) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information. These controls are particularly important here given the significant amount of cash that flows through the Debtors' consolidated cash management system on a daily and annual basis.

68.     In addition, given the corporate and financial structure of the Debtors, I believe that it would be difficult, if not impossible, for the Debtors to establish an entirely new system of accounts and a new cash management system. Preserving the "business as usual"

atmosphere and avoiding the unnecessary distractions that would inevitably be associated with any substantial disruption in the Debtors' cash management system obviously will facilitate the Debtors' efforts to maximize the value of their assets for the benefit of their creditors in these bankruptcy proceeding.

69.     Furthermore, Lender Group has expressly conditioned its willingness to extend postpetition financing on the continuation of the Debtors' cash management system as described above. The Lender Group is familiar with the cash management system and its procedures, and will rely on the cash management system to monitor their collateral while held by the Debtors.

70.     If the Debtors are not permitted to continue to utilize their consolidated cash management system in its current form, their ability to conduct an orderly liquidation of their assets would be severely, and perhaps, irreparably, impaired. Based on the foregoing, I submit that maintenance of the existing cash management system is in the best interests of the Debtors, their creditors and other parties in interest and is necessary for the efficient and orderly liquidation of the Debtors' assets. Accordingly, the Debtors seek authorization for the continued use of their existing cash management system.

### 4.     Limited Waiver of Bankruptcy Code § 345.

71.     The Debtors' funds are swept on a daily basis into the Concentration Account, the funds in which are used immediately to pay debt service or fund the Disbursement Accounts to be used for contemporaneous payment of payroll and other operating expenses. The Debtors rarely have an available balance or deposit at any single bank in excess of $55,000 or a ledger balance or deposit at any single bank in excess of $250,000, which balance typically is

promptly swept or otherwise applied by the Debtors as set forth above. The Debtors submit that their funds will not be sufficiently at risk to necessitate strict adherence to the requirements of Bankruptcy Code § 345(b). Moreover, if granted a waiver, the Debtors will not be required to incur the significant administrative difficulties and expenses relating to opening new accounts to ensure that all of its funds are fully insured or invested strictly in accordance with the restrictions established by Bankruptcy Code section 345. Therefore, the Debtors seek a waiver pursuant to section 345(b) of the Bankruptcy Code without the need to post a bond.

72.     I am informed by counsel that section 345(a) of the Bankruptcy Code authorizes deposits or investments of money of estate, such as the Debtors' cash, in a manner that will yield the maximum reasonable net return on such funds, taking into account the safety of each deposit or investment. I am further informed by counsel that when deposits or investments are not insured or guaranteed by the United States or backed by the full faith and credit of the United States, section 345(b) of the Bankruptcy Code provides that, unless the court for cause orders otherwise, the estate must require from the entity with which the money is deposited or invested a bond in favor of the United States that is secured by the undertaking of an adequate corporate surety.

73.     I am further informed by counsel that section 345(b) therefore expressly provides that the Court may modify these requirements for cause. The Debtors submit that in the circumstances, just cause exists to authorize the Debtors to continue to invest excess cash ("Investable Funds") in substantially the same manner as set forth above as the Debtors have invested such funds prior to the Petition Date.

74.     Based on the foregoing reasons, I submit that an order granting the relief requested in this above-mentioned motion is in the best interests of the Debtors, their estates, their creditors and other parties-in-interest.

**K.     Motion For Entry Of An Order (a) Authorizing, But Not Requiring, Payment Of Certain Prepetition: (i) Wages, Salaries, Commissions, And Other Compensation; (ii) Employee Medical, Pension And Similar Benefits; (iii) Reimbursable Employee Expenses; and (iv) All Costs Incident to the Foregoing; And (b) Authorizing And Directing Applicable Banks And Other Financial Institutions To Receive, Process, Honor And Pay All Checks Presented For Payments And To Honor All Funds Transfer Requests Made By The Debtors Relating To The Foregoing**

**1.     Employee Wages and Benefits – In General**

75.     Prior to the commencement of the Debtors' bankruptcy cases, the Debtors terminated approximately 115 employees in contemplation of the orderly liquidation of the Debtors' assets (the "Terminated Employees"). The Debtors paid all outstanding wages (exclusive of vacation pay to the non-California Terminated Employees) prior to the commencement of these bankruptcy cases. The Debtors currently employ a total of approximately 1,168 full time employees and 168 part time employees in hourly, salaried, supervisory, commissioned, management and administrative positions to perform the functions necessary to effectively and efficiently conduct an order by liquidation of the Debtors' assets and the Debtors' business (collectively, the "Retained Employees" and, with the Terminated Employees, the "Employees"). To minimize the personal hardship the Debtors' Employees will suffer if prepetition employee-related obligations are not paid when due or honored as expected, and to maintain the morale of the Retained Employees during this critical time, the Debtors, by this Motion, seek authority, in their discretion, to pay and/or honor, as the case may be, certain prepetition claims for, among other items, wages, salaries, commissions, sales bonuses, and other

compensation, vacation, sick time, paid time off and floating holidays, payroll-related Taxes

(defined below), other Withheld Amounts (defined below) (such as garnishments, Employees'

share of insurance and other benefits payments, disability and 401(k) contributions), medical

benefits, contributions to employee benefit plans and all other employee benefits (collectively,

"Employee Benefits") that the Debtors historically have paid in the ordinary course of their

business, to reimburse certain reimbursable unpaid employee Unpaid Expenses (defined below),

and to pay all costs incident to the foregoing (collectively, and as more fully described below, as

the "Employee Wages and Benefits"). The Employee Wages and Benefits for which this relief is

sought are set forth in detail below.

76.     The Debtors additionally seek authority for the applicable banks and other

financial institutions, in accordance with the Debtors' instructions, to receive, process, honor and

pay all checks presented for payment and to honor all electronic payment requests made by the

Debtors related to the Employee Wages and Benefits.

## 2.     Unpaid Wages and Payroll Taxes

77.     The Debtors recognize the Bankruptcy Code's treatment of unsecured

claims of employees for wages, salary, overtime and other types of monetary compensation

("Unpaid Wages") earned within ninety days before the date of filing. The Debtors are unaware

of any Employee being owed more than $4,925 for Unpaid Wages (excluding commissions as

set forth in the Motion), and the Debtors, if this Motion is granted, will use their best efforts to

ensure that no single Employee is paid more than $4,925 for such Unpaid Wages (excluding

commissions as set forth in the Motion).[3] The Debtors seeks to pay the Unpaid Wages and the

Debtors' payroll-related taxes (such as employer's FICA payments, Social Security payments,

Medicare, unemployment, federal, state and local withholding taxes (collectively, the "Payroll

Taxes"). The Debtors believe that they may owe amounts up to $700,000 in Unpaid Wages

(excluding commission amounts, which the Debtors estimate to be up to $525,000.00) plus

amounts payable on account of certain uncashed "live" checks previously issued or to be issued

for Unpaid Wages (excluding commission amounts) to certain of the Debtors' Employees who

are not paid by direct deposit. The Debtors believe that they may owe up to $310,000 in unpaid

Payroll Taxes on account of payrolls and commission obligations applicable to prepetition

periods.

### 3. Paid Time Off

78. The Debtors offer paid vacation of between one week and four weeks per

year, which varies by Debtor and length of service with that Debtor ("Vacation Time"), and paid

sick leave of between 3 and 7 days per year, which varies by Debtor, and a small number of

floating or optional holidays to employees of certain of the Debtors' divisions (collectively,

"PTO").

79. By this Motion, the Debtors seek authority, in their business judgment, (a)

to pay Terminated Employees for their accrued and unused Vacation Time on the dates indicated

---

3 The Debtors are unable to determine precisely at this time whether any Employee's Unpaid Wages when
calculated to include commissions may exceed $4,925. It is possible though unlikely that the Unpaid Wages
payable to each of two or three of the Debtors' most productive sales Employees will exceed the $4,925 by an
amount of no more than $1,000, each, or a total of $3,000 in the aggregate for all sales Employees. The Debtors
request authority by this Motion to pay such de minimus amounts in excess of the $4,925 priority amount for these
two or three employees, because of the Debtors' sales force and in particular the Debtors' most productive sales
Employees are vitally important to the Debtors' maximizing their revenues at this crucial time.

in the budget attached to the Debtors' Motion for approval of the debtor in possession financing (the "Financing Motion") filed contemporaneously with this Motion (the "Budget"), assuming that the Financing Motion and the Budget are approved by this Court, and (b) to honor accrued and unused prepetition PTO in the ordinary course of business for Retained Employees, and to pay Retained Employees for their accrued and unused Vacation Time on the dates indicated in the Budget, assuming that the Budget and the Financing Motion are approved by this Court.

4. **Employee Benefits**

80.     The Debtors have established various plans and policies to provide its Employees with medical, dental and vision insurance, life insurance, disability and/or other similar benefits (collectively, the "Employee Benefits"). The Employee Benefits are described below.

### Medical, Dental and Vision Benefits

81.     The Debtors maintain several different group medical insurance plans (the "Group Plans") that provide medical, dental and vision coverage for their Employees. The Debtors provide the Group Plans to all Employees at minimal cost to the Employees as set forth on Exhibit A to the Motion. Employees may cover dependents at a minimal monthly additional cost while the Debtors pay the remainder of the monthly premium rates for the Employees' dependents. The Group Plans are administered by Benefits Coordinators Corporation ("BCC"). The various Group Plans include CIGNA Healthcare (which includes a PPO Network plan and a POS Network plan as well as non-network benefits) and Kaiser Permanente. The Debtors offer Employees dental coverage that is administered by Delta Dental of NJ and is self-insured by the Debtors, and vision coverage that is provided by Vision Services Plan. Collectively, attached as

Exhibit B to the Motion, are the Debtors' Employee Benefits schedules, which describe all of the Group Plans, and other similar Employee Benefits, currently maintained by the Debtors, including monthly average amounts paid by the Debtors to maintain their benefit plans.

82.     The Debtors also contribute to two union health and welfare plans that provide medical coverage to union employees (the "Health and Welfare Plans").

83.     To the extent that any premiums, claims or fees remain unpaid on the Petition Date relating to the Group Plans, the Health and Welfare Plans and other Employee insurance policies (described below) currently maintained by the Debtors, or to the Debtors' self-insurance obligations, the Debtors seek authorization, in their discretion, to pay those amounts in the ordinary course of their business. As with the Unpaid Wages, current and future Employees and their families rely on the Debtors to provide continuing health insurance and other Employee Benefits. Any failure to pay these unpaid amounts would seriously harm such Employees' welfare, morale and expectations. As of the Petition Date, the Debtors estimate that they owe $2,750 in unpaid Group Plan premiums, and approximately $67,500 to the Health and Welfare Plans. In addition, the Debtors formerly were self-insured with respect to certain medical claims, of which approximately $20,000 may be outstanding upon final determination, and for which the Employee receiving the medical service would be liable if the Debtors failed to make payment.

### Employee Life and Disability Insurance Benefits

84.     The Debtors also maintain various insurance policies for their Employees with Reliance Standard Life ("Reliance"), (life insurance, and accidental death and dismemberment), and Jefferson Pilot ("Jefferson") (life insurance and accidental death and dismemberment) (collectively, the "Life and Accident Insurance"). The Life and Accident

Insurance Plans cover nearly all of the Debtors' full-time employees. In general, the Debtors pay approximately $21,014 in monthly premiums in connection with the Life and Accident Insurance Plans. As of the Petition Date, the Debtors estimate that there are no unpaid amounts with respect to its Life and Accident Insurance Plans.

85. The Debtors also provide group travel accident insurance for Employees who are injured while traveling outside of the United States on company business ("Foreign Travel Insurance"). The Debtors' Foreign Travel Insurance is provided by Reliance and provides key Employees with up to $500,000 (with an aggregate limit of $2,500,000) for accidental death or dismemberment (as defined in the Foreign Travel Insurance policy) while traveling on business on behalf of the Debtors. The annual cost to the Debtors of providing Foreign Travel Insurance is approximately $475. As of the Petition Date, the Debtors believe that they are current on their Foreign Travel Insurance Premiums.

86. The Debtors also maintain various short-term and long-term disability insurance policies for certain of their Employees (the "Disability Plans"). The short-term Disability Plan is maintained with Reliance. In addition, the Debtors participate in certain State-sponsored short-term Disability Plans by making payroll tax payments to agencies of the States of New Jersey and California. The Debtors pay approximately $2,700 in monthly premiums in connection with the Reliance short-term Disability Plan and make aggregate payroll tax payments of approximately $16,545 per month to the New Jersey and California agencies for those Disability Plans. The Debtors also maintain certain long-term Disability Plans with Reliance and Jefferson, funded in whole or in part by the Debtors. The Debtors pay approximately $19,000 in monthly premiums in connection with the long-term Disability Plans.

As of the Petition Date, the Debtors believe that there are no unpaid amounts in the aggregate with respect to the short-term and long-term Disability Plans.

87. To the extent that any premiums remain unpaid, as of the Petition Date, on the Life and Accident Insurance Plans, Foreign Travel Insurance policy or Disability Plans, or any amount remains unpaid on the State-sponsored Disability Plans, the Debtors seek authorization, in their discretion, to pay those amounts in the ordinary course of their business.

## 401(k) Plan

88. The Debtors maintain a 401(k) retirement and incentive savings plan (the "401(k) Plan") that allows Employees to defer up to $13,000, subject to annual limitations, of their gross wages pre-tax, toward their retirement. The Debtors match Employee contributions in connection with the 401(k) Plan dollar for dollar up to the first $400.00 contributed by the Employee. The 401(k) Plan is administered by ING Life Insurance and Annuity Co. ("ING") and costs approximately $55,000 per year to maintain. As of the Petition Date, the Debtors estimate that their total outstanding obligations with regard to the administration of the 401(k) Plan are approximately $25,000 (which consists of $25,000 in annual audit fees). ING currently administers approximately $2,600,000 in 401(k) contributions for the benefit of the Debtors' Employees. The Debtors also contribute to qualified pension plans for certain union employees (the "Qualified Plans"). The Debtors currently owe approximately $36,000 to the Qualified Plans. Accordingly, the Debtors request authority, in their discretion, to pay any amounts owed to maintain the 401(k) Plan as of the Petition Date and to continue to pay obligations associated with the maintenance and continuation of the 401(k) Program as such amounts become due in

the ordinary course of business, and to pay the amount owed to the Qualified Plans as of the
Petition Date.

## Flexible Spending Plan

89.     The Debtors offer a flexible spending plan that enables certain Employees
to elect to contribute pre-tax dollars deducted from the participating Employees' salaries to pay
for eligible medical and dependant care expenses incurred during the year (the "Flexible
Spending Plan"). The Flexible Spending Plan is a typical "cafeteria" plan authorized pursuant to
section 125 of the Internal Revenue Code and allows Employees the benefit of tax-free payment
of eligible medical and dependant care expenses incurred in the course of the calendar year.
Under the Flexible Spending Plan, Employees may also elect to defer up to $1,500 for qualified
out-of-pocket health care expenses and $5,000 for qualified out-of-pocket dependent care health
expenses. The Debtors' cost of administering the Flexible Spending Plan, including costs
associated with processing contributions and reimbursement requests submitted by Employees, is
de minimus. As of the Petition Date, the Debtors estimate that there are no unpaid amounts
attributable to the administration of the Flexible Spending Plan and approximately $7,428 held in
trust for the benefit of the Debtors' Employees on account of amounts withheld under the
Flexible Spending Plan. Because the amounts withheld under the Flexible Spending Plan are
held by the Debtors in trust for the benefit of the Employees, such amounts do not constitute
funds that would otherwise comprise estate property under section 541(a) of the Bankruptcy
Code. Accordingly, the Debtors request authority to pay unpaid administrative costs attributable
to the administration of the Flexible Spending Plan and to otherwise honor such Plan.

## Employee Assistance Programs

90.     Along with the other Employee Benefits programs described above, the
Debtors also offer their Employees an employee assistance program that provides Employees
with financial, legal, educational, child and elder care issues. The work life assistance program
is provided by EAP Company and allows Employees to access certain toll free telephone
information and obtain up to 5 assessments and treatments per family unit per year. The
aggregate average cost to the Debtors of the work life assistance program is $20,625 per year.
As of the Petition Date, the Debtors estimate that they owe approximately $5,000 in unpaid
amounts due to EAP Company under the work life assistance program.

### 5.     Withheld Amounts

91.     The Debtors deduct Withheld Amounts from Employees' paychecks,
(collectively, the "Employee Deductions"). The Debtors forward amounts equal to the Withheld
Amounts from their general operating accounts to appropriate third-party recipients. Prior to the
Petition Date, unremitted Withheld Amounts totaled approximately $278,000. Due to the
commencement of these Chapter 11 cases, these funds were deducted from Employee paychecks,
but may not have been forwarded to appropriate third-party recipients. By this Motion, the
Debtors seek authority to forward the Withheld Amounts to the appropriate parties.

### 6.     Unpaid Expenses

92.     Prior to the Petition Date and in the ordinary course of business, the
Debtors reimbursed Employees for certain expenses incurred in the scope of their employment.
Most of the Debtors' business expenses are attributable to the Debtors' Employees engaged in
travel. As a result of the timing of the commencement of this case, as of the Petition Date, the

10776-001\DOCS_DE:96250.5                    36

Debtors estimate that they owe approximately $16,000 in prepetition reimbursable Unpaid

Expenses relating to, among other things, business-related travel expenses, business meals,

phone costs, auto expenses (including expenses), and other miscellaneous business expenses.

All of these expenses were incurred on the Debtors' behalf, and with the understanding that these

expenses would be reimbursed. Accordingly, to avoid harm to these Employees, and the

resulting harm to employee morale, the Debtors seek the authority to pay the Unpaid Expenses in

the ordinary course of business.

L.      **Motion Of Debtors For Entry Of Order Regarding The Debtors'**
        **Postpetition Continuation of Prepetition Programs and Practices**

            93.     Prior to the Petition Date and in the ordinary course of their business, the

Debtors engaged in certain promotional practices and programs intended to increase sales to

customers and develop and sustain a competitive position in the marketplace (the "Prepetition

Customer Practices"). In light of the Debtors' decision to conduct an orderly liquidation of their

assets, the Debtors have determined that it is in the best interests of their estates to modify many

of these Prepetition Customer Practices as described in detail herein. As discussed below, the

Debtors are attempting to address issues likely to arise with their customers in a prudent and

responsible manner consistent with their duties to maximize value to stakeholders according to

the priorities established by the Bankruptcy Code. Accordingly, while the Debtors intend to

honor certain Prepetition Customer Practices, albeit some in modified form, the Debtors have

determined that some of such Prepetition Customer Practices will result in adverse economic

consequences to the Debtors' estates. Importantly, a critical component of the Debtors'

agreement with a liquidating agent (the "GOB Agent") to conduct going-out-of-business sales at

the Debtors' store locations was the GOB Agent's agreement to assist the Debtors in addressing certain customer issues likely to arise during the course of these cases. Similarly, as of June 28, 2004 when it appeared reasonably likely that the Debtors would be seeking to conduct an orderly liquidation of their assets through the filing of chapter 11 bankruptcy cases, the Debtors and the Lender Group agreed to set aside certain monies received from customers after that date in connection with deposits provided by such customers, for which the Debtors seek authority to return to such customers under certain circumstances described herein.

94.     Accordingly, by this Motion, the Debtors request entry of an order setting forth the manner in which the Debtors will continue to honor Prepetition Customer Practices during the orderly liquidation of their assets.

95.     The Debtors' decision to conduct an orderly liquidation of the Debtors' assets requires the Debtors to consider which of their Prepetition Customer Practices are beneficial to the Debtors' estates and should be honored, or maintained, in their present or modified forms, as the case may be, and which of the Prepeition Customer Practices should be halted as of the Petition Date. In making such determinations, the Debtors were cognizant of the effect such decisions would have on their customers. The Debtors have also attempted to mitigate such affects through the negotiations with the GOB Agent and through agreements with the Lender Group.

96.     To the extent the Debtors seek to continue or honor the Prepetition Customer Practices, they have determined that doing so is in the best interest of their estates and will maximize value for stakeholders. Specifically, honoring or maintaining certain of the Prepetition Customer Practices will allow the Debtors to generate additional income not

otherwise available if such Prepetition Customer Practices were discontinued. Conversely, if the Debtors, in the exercise of their business judgment, determined that honoring or maintaining Prepetition Customer Practices will deplete the estates with no corresponding benefit, they have determined to decline to honor or maintain such benefits.

97. The following paragraphs describe the Prepetition Customer Practices and in what manner the Debtors (each occasionally a "Company" in the following paragraphs) intend to continue, modify or discontinue them after the petition date.

## Customer Practices and Policies

I. **Deposits.**

A. Deposits Relating to Orders Where Goods to Fill Orders are On Hand ("Filled Order Deposits"). As of July 6, 2004 the Company had received approximately $5.3 million of Filled Order Deposits. The Company intends to honor all orders that are the subject of Filled Order Deposits. Customers have the option of electing one of the following: (a) to the extent that the Company is prepared to schedule a delivery of an order which is the subject of a Filled Order Deposit prior to July 30, 2004, the customer may schedule such delivery and accept such delivery provided, however, that the Company will require payment in full to be made pursuant to a cashiers check (the "Check Only Policy"); (b) if the customer elects to not receive the delivery prior to July 30 under the Check Only Policy then the customer may defer delivery of the order until after July 30, 2004 when it is expected that the liquidators will be in a position to accept credit cards with respect to such delivery. Under no circumstance will customers who have provided Filled Order Deposits be entitled to a return of any portion of the monies that constitute a Filled Order Deposit or a store credit in the amount of any portion of the Filled Order Deposit.

B. Deposits Relating to Orders Where Only a Portion of the Goods to Fill Orders are On Hand ("Partially Filled Order Deposits"). The treatment of customers who have provided the Company with Partially Filled Order Deposits which are deposits for special orders but for which, as of July 14, 2004, the Company only has a portion of the goods which are the subject of those special orders on hand, will depend upon whether the customer provided such Partially Filled Order Deposits before or after June 28, 2004. The Company, with the assistance of their court-approved liquidators is making every effort to be in a position to fill the special orders that are the subject of the Partially Filled Order Deposits.

i.  Post-June 28, 2004 Partially Filled Order Deposits. As of July 6, 2004, the Company had approximately $1.2 million in Post-June 28, 2004 Partially Filled Order Deposits. Customers who provided the Company with a Post-June 28, 2004 Partially Filled Order Deposit may elect either of two options. First, the customer can elect to have the Company attempt to fill the special order that is the subject of the Post-June 28, 2004 Partially Filled Order Deposit. The Company should be in a position within several weeks to determine whether they will be able to fill such special order (the "Fill Order Option"). Alternatively, the customer may obtain either a refund of the Post-June 28, 2004 Partially Filled Order Deposit or a store credit in the amount of the Post-June 28, 2004 Partially Filled Order Deposit (the "Return/Store Credit Option"). Unless the customer informs the Company by July 30, 2004 to the contrary, the Company will assume that the customer has made the Fill Order Option. Thereafter, if the Company is able to accommodate the Fill Order Option then the customers only right shall be to accept the Fill Order Option. However, if either (a) the customer affirmatively elects the Return/Store Credit Option; or (b) the customer is deemed to have elected the Fill Order Option but the Company cannot fill that order, then the customer, at its election can either receive a check in the amount of the Post-June 28, 2004 Partially Filled Order Deposit, or, alternatively, a Store Credit in the full amount of such Post-June 28, 2004 Partially Filled Order Deposit.

ii. Pre-June 28, 2004 Partially Filled Order Deposit. As of July 6, 2004, the Company had approximately $2.9 million in Pre-June 28, 2004 Partially Filled Order Deposits. Customers who provided the Company with a Pre-June 28, 2004 Partially Filled Order Deposit may receive a store credit in the full amount of the Pre-June 28, 2004 Partially Filled Order Deposit provided that the customer meets two conditions (the "Partially Filled Order Credit"). First, the customer must exercise the Partially Filled Order Credit on or before July 30, 2004. Second, the customer must exercise the Partially Filled Order Credit in a transaction pursuant to which the retail price of such transaction in which the customer elects to apply the Partially Filled Order Credit to is two times the amount of the Partially Filled Store Credit, on a pro rata basis. For example, if a customer has a $500 Partially Filled Store Credit, the customer may use the entire Partially Filled Store Credit if the customer buys product with a retail price of $1,000 or more. If the customer buys product with a retail price of $800, then the customer may use $400 of the Partially Filled Store Credit. If the customer does not fulfill BOTH of these two conditions, then the customer will not be able to exercise the Partially Filled Order Credit and will not receive a return of the Pre-June 28, 2004 Partially Filled Order Deposit. Alternatively, the customer may forego use of the Partially Filled Store Credit and, instead, request that the Company, through its liquidators attempt to fill the special order which is the subject of the Pre-June 28, 2004 Partially Filled Order Deposit in which case, the

customer will have no right to the Partially Filled Store Credit if the order cannot be fulfilled and will not receive a return of the Pre-June 28, 2004 Partially Filled Order Deposit.

C. Deposits Relating to Orders Where None of the Goods to Fill Orders are On Hand ("Unfilled Order Deposits"). The treatment of customers who have provided the Company with Unfilled Order Deposits which are deposits for special orders but for which, as of July 14, 2004, the Company does not have any of the goods which are the subject of those special orders on hand, will depend upon whether the customer provided such Unfilled Order Deposits before or after June 28, 2004.

   i. Post-June 28, 2004 Unfilled Order Deposits. As of July 6, 2004, the Company had approximately $2.2 million in Post-June 28, 2004 Unfilled Order Deposits. Customers who provided the Company with a Post-June 28, 2004 Unfilled Order Deposit may obtain either a refund of the Post-June 28, 2004 Unfilled Order Deposit or a store credit in the amount of the Post-June 28, 2004 Unfilled Order Deposit which store credit can be used for the purchase of any merchandise at the Company's stores or warehouses.

   ii. Pre-June 28, 2004 Unfilled Order Deposit. As of July 6, 2004, the Company had approximately $4.3 million in Pre-June 28, 2004 Unfilled Order Deposits. Customers who provided the Company with a Pre-June 28, 2004 Unfilled Order Deposit may receive a store credit in the full amount of the Pre-June 28, 2004 Unfilled Order Deposit provided that the customer meets two conditions (the "Unfilled Order Credit"). First, the customer must exercise the Unfilled Order Credit on or before July 30, 2004. Second, the customer must exercise the Unfilled Order Credit in a transaction pursuant to which the retail price of such transaction in which the customer elects to apply the Unfilled Order Credit to is two times the amount of the Unfilled Store Credit, on a pro rata basis. For example, if a customer has a $500 Unfilled Store Credit, the customer may use the entire Unfilled Store Credit if the customer buys product with a retail price of $1,000 or more. If the customer buys product with a retail price of $800, then the customer may use $400 of the Unfilled Store Credit. If the customer does not fulfill BOTH of these two conditions, then the customer will not be able to exercise the Unfilled Order Credit and will not receive a return of the Pre-June 28, 2004 Unfilled Order Deposit.

## II. Continued Technical/Repair Support for Delivered Products.

A. Current Policy. The Company pay the costs associated with making outside providers ("Third Party Repair Providers") available to the Company's customers to fix damaged products delivered by the Company to the customer (the "Repair Service"). Upon a request from a customer, a Third Party Repair Provider or Company employee is dispatched to address the customer's concern.

B. <u>Proposed Policy</u>. The Company will continue to provide Repair Service through the Third Party Repair Providers for all deliveries made by the Company prior to July 30, 2004 provided that the Company receives a request from such customer that permits the Company to complete the Repair Service on or before August 30, 2004.

## III. <u>Warranty Service</u>.

A. <u>Current Policy</u>. Currently, customers are offered two types of warranty service with respect to the purchase of product from the Company. First, to the extent that there are any manufacturers warranties made available by the manufacturers of that product, such warranties are passed on to the customer to the extent transferable (the "Manufacturers Warranties"). Second, the Company offers customers the opportunity to purchase extended warranties (the "Extended Warranties"). The Extended Warranties are offered through the Gold Protection Plan pursuant to which Guardsman is responsible for providing such coverage.

B. <u>Proposed Policy</u>. The Company will continue to pass on Manufacturers Warranties to the extent transferable. As of July 14, 2004, the Company will no longer offer Extended Warranties for purchase. With respect to Extended Warranties which were purchased prior to July 14, 2004, customers should contact Guardsman at (877) 584-GOLD (4653) and pursue their rights under the Extended Warranties.

## IV. <u>Gift Certificates/Coupons</u>.

A. <u>Current Policies</u>. Prior to July 14, 2004, the Company issued coupons redeemable for the purchase of goods at the Company's retail locations (the "Coupons"). Generally, the Coupons were in either a specific amount or entitled the customer to a 10% discount on product purchased. In addition, prior to July 14, 2004, the Company sold gift certificates to customers that could be used towards the purchase of the Company's product (the "Gift Certificates"). The Company estimates that total outstanding and unused Gift Certificates, and the total amount of potential exposure with respect to Coupons is less than $200,000.

B. <u>Proposed Policies</u>. The Company will honor Coupons and Gift Certificates and will instruct liquidators conducting going-out-of-business sales at the Company's stores to honor Coupons and Gift Certificates.

## V. <u>Refunds/ Store Credits</u>.

A. <u>Current Policy</u>.

i. <u>Store Credits</u>. Prior to July 14, 2004, the Company's policy was to allow customers to cancel pending orders under certain circumstances.

Specifically, customers who decided to cancel a custom order forfeited their deposit. A customer who decided to cancel an order that was not a custom order was entitled to either a store credit that could be used for the purchase of alternative product (a "Store Credit") or return of their deposit (a "Deposit Return").

ii. Refunds. Prior to July 14, 2004, Customers who submitted an order but within three days were entitled to cancel such order and obtain a full refund. In addition, if the goods were delivered to the customer but the customer decided to return such goods within fourteen days of delivery, the customer was also entitled to a refund unless it was a custom order (collectively, a "Refund") or a Store Credit.

B. Proposed Policies.

i. Store Credits. All Store Credits, either those that were processed prior to July 14, 2004 or those that are processed after July 14, 2004 but which relate to deliveries, which occurred prior to July 14, 2004, will be redeemable as follows. A customer will be entitled to redeem a Store Credit, or any part thereof, provided that the retail price of the transaction in which the customer elects to apply the Store Credit to is two times the amount of the Store Credit. For example, if a customer has a $500 Store Credit, the customer may use the entire Store Credit if the buys product with a retail price of $1,000 or more. If the customer buys product with a retail price of $800, they may use $400 of the Store Credit. In addition, all sales after July 14, 2004 will be "as is", "where is" and on a "final basis" such that customers will not be entitled to any Refunds or Store Credits with respect to such product.

ii. Refunds. As of July 14, 2004, the Company will no longer issue any Refunds to customers for product purchased prior to July 14, 2004. In addition, all sales after July 14, 2004 will be "as is", "where is" and on a "final basis" such that customers will not be entitled to any Refunds with respect to such product.

98.     Collectively, the foregoing practices and procedures shall be referred to as

the "Modified Customer Practices."

99.     As discussed above, the Debtors, in consultation with the Lender Group

carefully evaluated all of the Debtors' Prepetition Customer Policies to determine the best way to

maximize value for the Debtors' stakeholders while at the same time mitigating the effect of the

Debtors' bankruptcy on customers. The product of those efforts are the procedures set forth above and the commitment of the GOB Agent to work with the Debtors to address concerns regarding outstanding customer deposits.

100.    A significant aspect of the Modified Customer Practices is the Debtors' treatment of deposits received by customers after June 28, 2004, the date when it appeared reasonably likely that the Debtors would be seeking to conduct an orderly liquidation of their assets through the filing of chapter 11 bankruptcy cases. As a result of an agreement between the Debtors and the Lender Group, the Debtors segregated certain deposits from customers received after June 28, 2004 as described in detail in the Modified Customer Practices and in the Letter Agreement between the Debtors and the Lender Group attached hereto as Exhibit A to the Motion (the "Letter Agreement"). As set forth in the Letter Agreement, the Lender Group has agreed to provide the Debtors with funds which constitute the proceeds of certain deposits received after June 28, 2004 subject to the conditions set forth in the Letter Agreement and the relief requested in this Motion.

101.    In connection with the Letter Agreement, and pursuant to the relief requested in this Motion, the Debtors request that the Court order approving this Motion provide that upon the return of any deposit for Post June 28 Partial Orders Which Can't Be Filled (as defined in the Letter Agreement) or any deposit for Post June 28 Unfilled Orders (as defined in the Letter Agreement) by the Lender Group to the Debtors (collectively, the "Returned Deposits"), the Lender Group shall have no further or other liability, obligation or responsibility to any party or entity arising from, with respect to, or in connection with such Returned Deposits, and any and all claims and causes of action against the Lender Group, if any, arising from, with

respect to, or in connection with such Returned Deposits will be released and waived by the Debtors and any other third parties. The Lender Group shall not have, and shall not be deemed to have, any obligation or responsibility to direct or cause the Debtors to remit or otherwise transfer such Returned Deposits to any other party or entity, including without limitation customers of the Debtors. Moreover, the Debtors shall agree to indemnify the Lender Group for any and all claims and causes of action solely relating to the Retained Deposits, which indemnification obligation shall be a superprioirity administrative claim in any such bankruptcy filing (which superpriority administrative claim shall be subject to the same carve-out as other superpriority claims pursuant to any order approving debtor in possession financing).

102.    As described above, addressing concerns of customers in a prudent manner consistent with the Debtors' duty to maximize value for stakeholders will greatly impact the success of the Debtors' efforts to liquidate their assets. The Modified Customer Practices are thereby extremely important to the Debtors' goal of maximizing the value of their estates.

103.    Accordingly, the Debtors requests that they be authorized, but not directed, in their business judgment, to honor, modify or discontinue, as the case may be, the Modified Customer Practices without further application to the Court.

**M.      Motion Of Debtors For Authority To Pay Certain Prepetition Sales, Use, Franchise And Similar Taxes In The Ordinary Course Of Business**

104.    The Debtors seek authority to pay, in their sole discretion, certain sales, use, franchise, excise and similar tax obligations and assessments, and any related fees and other charges (collectively "Taxes") to the relevant taxing authorities (collectively, the "Taxing Authorities") in the ordinary course of business.

105.     In connection with the normal operation of their businesses, the Debtors incur Taxes and collect certain Taxes consisting of sales, use, franchise, excise and similar taxes from their customers on behalf of various Taxing Authorities located in approximately six states for payment to such Taxing Authorities. The Debtors pay Taxes to the various Taxing Authorities on a monthly, quarterly or yearly basis, depending on the particular Tax.

106.     As of the Petition Date, the Debtors' financial records indicate that the Debtors are substantially current on their payments of Taxes to all Taxing Authorities. However, since Taxes typically are paid in arrears, there exist Taxes for periods prior to the Petition Dates which may not have been paid. Accordingly, the Debtors seek authority to pay any Taxes which accrued prior to the Petition Date but which were not in fact paid Prior to the Petition Date, or were paid in an amount that is less than is actually owed, or if any payments sought to be made prepetition are rejected, lost, did not clear or otherwise not received in full by any Taxing Authorities.

107.     In all cases, the Debtors believe that the failure to pay the Taxes could have a material adverse effect on their ability to conduct an orderly liquidation of their assets for the benefit of stakeholders. Initially, many of the states (depending upon the nature of the Taxes) are likely to take the position that funds on hand are held in trust for the benefit of the Taxing Authorities and do not constitute property of the Debtors' estates. Accordingly, honoring the Debtors' request to honor such Taxes does nothing more than honor applicable non-bankruptcy law with respect to the character of such Taxes.

108.     The Debtors operate a retail business in various local markets and many disputes which could impact their ability to conduct business in a particular jurisdiction could

have a wide-ranging effect on the Debtors' liquidation efforts. Furthermore, the Debtors believe that some, if not all, of the Authorities may cause the Debtors to be audited if certain of the Taxes are not paid forthwith. Such audits will unnecessarily divert the Debtors' attention away from conducting an orderly liquidation of the Debtors' assets.

109. The payment of the Taxes is also necessary to avoid potential administrative difficulties. I am informed by counsel that a withholding of the payment of the Taxes likely may cause Taxing Authorities to take precipitous action, including a marked increase in state audits and a flurry of lien filings or lift stay motions. Prompt and regular payment of the taxes will avoid this unnecessary governmental action

110. I am informed by counsel that to the extent that any sales, use and excise taxes remain unpaid by the Debtors, the Debtors' officers may be subject to lawsuits or criminal prosecution during the pendency of these Chapter 11 cases. The possibility of any such lawsuit or criminal prosecution would distract the Debtors and their officers in their attempt to implement a successful liquidation strategy, to the detriment of all parties-in-interest in these Chapter 11 cases.

111. I am informed by counsel that the sales and use and excise taxes and franchise taxes and related fees may be entitled to priority status pursuant to section 507(a)(8) of the Bankruptcy Code and must be paid before the claims of general unsecured creditors. The Lender Group acknowledges and supports the propriety of making these payments for the reasons set forth in this Motion.

112. Accordingly, I believe that an order granting the relief requested in this motion is in the best interests of the Debtors' estates, their creditors and other parties-in-interest.

**N.    Motion For Authority To Pay In The Ordinary Course Of Business Prepetition Claims Relating To Shipping and Warehousing Charges**

113.    By this Motion, the Debtors seek authority of the Court (a) to pay certain prepetition claims related to shipping and warehousing that the Debtors, in their business judgment, determine are necessary or appropriate to (i) obtain release of critical or valuable goods detained in transit pending payment, (ii) maintain a reliable, efficient and smooth distribution system and (iii) induce critical shippers to continue to carry goods and make timely delivery, and (b) continue to pay on a postpetition basis shippers in the ordinary course of business as they become due.

114.    The Debtors' primary source of revenue is derived from the retail sale of furniture. Continued sales of furniture depends, in substantial part, on the timely delivery of products to the Debtors' distribution centers and also from the Debtors' distribution centers to their retail stores and to the Debtors' customers. The filing of these Chapter 11 cases alone will undoubtedly have a detrimental effect on the Debtors' operations. Due to impending liquidation, the Debtors anticipate that parties holding the Debtors' goods, whether at warehouses, on trucks or otherwise, will be reluctant to part with such goods until they receive payment on account of their prepetition claims. Similarly, third-party delivery services may be in possession of Debtors' funds relating to previously completed deliveries. These parties may assert statutory liens with respect to such goods or funds to secure outstanding obligations owed to these parties prior to the Petition Dates. Unless the Debtors are permitted to honor such prepetition claims, the Debtors may not be able to obtain possession of such goods and deliver such goods to customers, all to the detriment of the Debtors' stakeholders by the loss of substantial revenues.

115.     As discussed above, the Debtors are dependent on third-parties shippers and warehousemen (collectively, the "Shippers" and "Warehousemen") to effect their distribution system. Accordingly, it is essential that these chapter 11 cases not be a reason or excuse for third parties to cease their timely services. The Debtors' continuing operations and efforts to maximize value of the estates for creditors depends on the ability to maintain a reliable and efficient distribution system.

116.     The Debtors currently depend on approximately ten (10) Shippers for inbound inventory shipments from manufacturers to the Debtors' stores and distribution facilities, and for outbound shipments to consumers, and three (3) Warehousemen who store goods in transit. A list of such Shippers and Warehousemen is set forth on **Exhibit "A"** attached to the Motion.

117.     Under the laws of many states, carriers or warehouseman, including shippers, have a lien on the goods in their possession, securing the charges or expenses incurred in connection with the transportation or storage of such goods. I am informed by counsel that under North Carolina law, which appears to be the applicable state law for the Shippers of a substantial portion of the Debtors' goods, both warehousemen and shippers may assert such a lien by statute, and that pursuant to section 363(e) of the Bankruptcy Code, a carrier or a warehouseman, as a bailee, may be entitled to adequate protection of a valid possessory lien. I am further informed by counsel that it is very likely, and very common, that the Shippers and Warehousemen will argue that they are entitled to possessory liens for transportation and/or storage of the goods in their possession as of the Petition Date. Accordingly, I believe that it is

likely that those Shippers and Warehouse men will refuse to deliver or release such goods before their claims have been satisfied and their liens redeemed.

118. The Debtors expect that, as of the Petition Date, certain of the Shippers and Warehousemen will have outstanding invoices for goods that were delivered to the Debtors or the Debtors' customers prior to the Petition Date and which are charged to the Debtors in the first instance (the "Shipping and Warehousing Charges"). If the Debtors do not pay these Shipping and Warehousing Charges, certain of the Shippers may cease to be cooperative and may withhold shipment of the Debtors' product.

119. The value of the products in the possession of the Shippers and Warehousemen and the potential injury to the Debtors if the product is not released are likely to greatly exceed the amount of such Shipping and Warehousing Charges. Among other things, it is critical to customer goodwill in an already difficult situation that there be no interruption in the timely delivery of product to the Debtors' customers. Accordingly, I believe that it is necessary and essential to the continuation of operations and the value of the estates that the Debtors be permitted to make payments on account of certain Shipping and Warehousing Charges.

120. Accordingly, by this Motion, the Debtors seek an order authorizing the Debtors, among other things, to make payments to the Shippers and Warehousemen as the Debtors, in their business judgment, determine are necessary or appropriate in order to obtain the release of the goods held by such Shippers and Warehousemen. Such payments, as reflected by the Debtors' recorded invoices as of the Petition Date, are anticipated to be approximately $640,000. I do not anticipate that it will be necessary to immediately pay this amount in full, but that such amounts will be paid over time in the ordinary course of business. In addition, the

Debtors seek authority to continue to pay, on a postpetition basis, Shippers and Warehousemen, including payments in the ordinary course of business as invoices become due. The Debtors seek authority to make such payments in the amounts and to the extent necessary to satisfy non-disputed shipping and warehousing charges and to satisfy potential, asserted, or actual possessory liens, if any, on the goods that may be held by a Shipper or Warehouseman pending payment of such charges. The Debtors represent that they will only pay Shipping and Warehousing Charges where they believe, in their business judgment, that the benefits to their estates and creditors from making such payments will exceed (i) the costs that the estates will incur by bringing an action to compel the turnover of such goods and (ii) the damages to their estates, including damages resulting from lost sales and delays associated with such actions.

121.    I believe that the total amount to be paid to the Shippers or Warehousemen if the requested relief is granted will be less than the losses the Debtors may suffer if their operations are disrupted. Moreover, I do not believe there are viable timely alternatives to the Shippers and Warehousemen which the Debtors have used prior to the Petition Date. The Debtors will make such changes to the extent it makes business sense to do so. However, there are only a limited number of appropriate carriers immediately available in the market. This fact coupled with the favorable rates the Debtors receive from current carriers will make any significant carrier changes impractical to execute from a business perspective.

## Financing

**O.  Motion of Debtors for Entry of Interim and Final Orders:  (1) Authorizing Secured Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014; (2) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363; and, (3) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(C)**

122.    By this Motion, the Debtors requests authority to incur postpetition financing in an amount up to $87,000,000, with up to $3,000,000 available on an interim basis pending final hearing, from the Lender Group allowable (subject to the terms of the proposed interim and final orders and the DIP Credit Agreement) as an administrative expense having priority over other administrative expenses and secured by a first priority priming lien in all present and after-acquired personal and real property of the Debtors' estates (the "Postpetition Financing").

123.    The Debtors need the proceeds of the Postpetition Financing in addition to their cash receipts to meet ongoing obligations necessary to run their businesses and operations and administer their Chapter 11 case, including to pay insurance, payroll, payroll expenses, rent, utility charges, professionals and general overhead, and to purchase necessary goods.  The Debtors believe that the Postpetition Financing will provide funds sufficient to permit the Debtors to conduct an orderly liquidation of their assets and honor their expenses during these Chapter 11 cases.

124.    Absent the Postpetition Financing, the Debtors' operations will cease and the Debtors will be unable to conduct an orderly liquidation and maximize the value of their assets.  Thus, the Debtors have an urgent need to obtain authority from this Court to obtain the Postpetition Financing to continue operations, administer their Chapter 11 cases, and conduct an

orderly liquidation of their assets for the benefit of their estates, creditors and other parties in interest.

125.     The Debtors sought to obtain Debtors in possession financing from other lenders in addition to the Lender Group. These lenders were not interested in pursuing the possibility of extending financing to the Debtors. The terms offered by the Lender Group were, in the business judgment of the Debtors, the best financing terms available.

126.     The Debtors then further negotiated with the Lender Group the terms of the proposed financing. The Debtors believe that the terms of the Postpetition Financing as set forth in this Motion and the proposed interim order (the "Interim Order") are the best financing terms currently available to the Debtors.

127.     Based on the Postpetition Financing, and the lack of any other meaningful alternatives, the Debtors have determined that they have no other choice but to accept the Postpetition Financing offered by the Lender Group. The Postpetition Financing affords the Debtors working capital necessary to operate and to support their efforts to conduct an orderly liquidation of their assets. The Debtors believe that the Postpetition Financing was entered into in good faith and upon the most favorable terms that could be achieved under the circumstances.

128.     The Debtors have reached agreement with the Lender Group for the Postpetition Financing on the terms and under the conditions set forth in the Interim Order attached to the Motion, the budget (the "Budget") attached to the Motion, the post-petition credit and guaranty agreement to be prepared and distributed in advance of the final hearing (the "DIP Credit Agreement"), and the Final Order referred to in the Motion, subject to this Court's approval.

## Summary of Interim Order and Final Order

The Debtors seek immediate entry of the Interim Order:

(1)     authorizing the Debtors to obtain the Postpetition Financing pursuant to the Budget, the financial covenants and other terms set forth in the the DIP Credit Agreement, and the Interim Order, on an emergency basis so as to prevent immediate and irreparable harm to the Debtors and their estates;

(2)     on the following terms:[4]

a.     Granting of Priming Liens:  To secure repayment of the Post-Petition Financing and Debtors' use of cash collateral, the Agent for the benefit of the Agent and the Lender Group and any other parties making revolving lending commitments under the DIP Credit Agreement ("the Senior Secured Parties") will be granted a valid and perfected first priority priming lien, subject and junior only to the Carve-Out (as defined below), on all present and after-acquired personal and real property of the Debtors of any nature whatsoever, including, without limitation, all cash contained in any account maintained by the Debtors, all causes of action existing as of the Petition Date and the proceeds thereof, all causes of action arising under the Bankruptcy Code (excluding preference actions and proceeds thereof), the title to which is held by any Debtor, or possession of which is held by any Debtor pursuant to any leasehold interest (collectively, with all proceeds and products of any or all of the foregoing, the "DIP Collateral") [Interim Order ¶ 6].  The Agent will continue to hold the liens securing the claims of the Agent and the Lender Group on account of the Pre-Petition Indebtedness of the Debtors (the "Pre-Petition Lenders"), which liens will be immediately junior in priority to the liens held by the Agent to secure the claims of the Senior Secured Parties.  [Interim Order ¶ 6];

b.     Post-Petition Liens and Cross-Collateralization:  Subject to the entry of the Final Order, the post-petition liens and security interests granted in the DIP Collateral under the DIP Credit Documents and the Interim Order will secure the Pre-Petition Indebtedness.  Subject to the entry of the Final Order, the post-petition priorities granted to the Agent for the benefit of the Senior Secured Parties will apply to

4 Defined terms used in this paragraph and not otherwise defined herein shall have the meanings given to such terms in the Interim Order.

all of the Indebtedness. The Senior Secured Parties and Pre-Petition Lenders will be entitled to all of the rights accorded to them pursuant to Bankruptcy Code section 507(b). [Interim Order ¶ 7 (the "Cross-Collateralization Provision")];

c.   Superpriority Administrative Claims: Subject to the Carve-Out, all of the indebtedness will have the highest administrative priority under Bankruptcy Code section 364(c)(1) and priority over all other costs and expenses of administration of any kind provided, however, the DIP Indebtedness shall be senior in priority to the Prepetition Indebtedness [Interim Order ¶ 11].

d.   Adequate Protection of the Pre-Petition Lenders: The Pre-Petition Lenders will receive as adequate protection against a diminution in the value of their pre-petition liens in property of the estates additional, valid and perfected liens in the DIP Collateral, junior to the liens granted to the Agent for the benefit of the Senior Secured Parties. If and to the extent that such additional liens are insufficient to satisfy any diminution in value of the Pre-Petition Collateral caused by the imposition of the priming lien, the Pre-Petition Indebtedness will be granted the priority status set forth in Bankruptcy Code section 507(b); provided that any such claims of the Pre-Petition Lenders will be subordinate in right of payment to all claims of the Agent for the benefit of the Senior Secured Parties. [Interim Order ¶ 7A];

e.   Termination of Post-Petition Financing: The Senior Secured Parties' agreement to make the Revolving Lending Commitments available and the Pre-Petition Lenders' consent to Debtors' use of cash collateral will be immediately and automatically terminated (except as may otherwise be agreed to in writing) and all Indebtedness will be immediately due and payable upon the earliest to occur of the following (the "Loan Payment Date"):

(i)    the next business day following the Final Hearing Date if a Final Order has not been entered on the Final Hearing Date;

(ii)   the date of final indefeasible payment and satisfaction in full of the Indebtedness;

(iii)  the effective date of any confirmed plan of reorganization;

(iv)    the consummation of the sale or other disposition of all or substantially all of the Debtors' assets on terms other than those set forth in the GOB Order;

(v)    (1) three business days following notice by the Agent of the occurrence of any violation by the Debtors of the Interim Order, or (2) immediately upon (i) the violation of any covenants set forth in the Interim Order or DIP Credit Documents, (ii) any violation of the Final Order, (iii) any Event of Default under the DIP Credit Documents, (iv) the Debtors' failure to execute and file a DIP Credit Agreement on or before July 20, 2004, (v) the Debtors' failure to obtain entry of an order authorizing the going-out-of-business sales described in the GOB Motion on or before July 30, 2004, nd/or (v) certain other enumerated events;

(vi)    the dismissal of any of the Chapter 11 cases or conversion thereof into a Chapter 7 proceeding;

(vii)    the entry of an order authorizing the appointment of a trustee or an examiner with enlarged powers, without the prior consent of the Lenders;

(viii)    the stay, reversal, vacatur, amendment or modification of the Interim Order or Final Order in any respect without the prior written consent of the Senior Secured Parties;

(ix)    the entry of any order or judgment modifying, limiting, subordinating or avoiding the priority of any Indebtedness or the perfection, priority or validity of (1) the Pre-Petition Lenders' pre-petition liens or (2) the post-petition liens held by the Agent for the benefit of the Senior Secured Parties on any DIP Collateral or (3) imposing, surcharging or assessing against the Pre-Petition Lenders' collateral or their claims or against any DIP Collateral or the Senior Secured Parties' claims any fees, costs or expenses, whether pursuant to Bankruptcy Code section 506(c) or otherwise; or

(x)    March 31, 2005 [Interim Order ¶ 5];

f.    <u>Carve-Out</u>: The Senior Secured Parties' liens on the DIP Collateral and their administrative claims under Bankruptcy Code section 364(c)(1) will be subject only to (a) the payment of any unpaid fees payable pursuant to 28 U.S.C. § 1930 and (b) the payment of allowed, unpaid claims for

fees and expenses incurred by Court-approved professionals prior to the Loan Payment Date, incurred before any of the Debtors, any other Credit Parties or the Committee have received notice or otherwise first have knowledge of an Event of Default and provided that such fees and expenses otherwise comply with the Budget and Interim Order. The Agent will reserve from the advance(s) made under the DIP Facility $100,000 (the "Professional Expense Cap"). The Professional Expense Cap will be available to pay fees and expenses, following the occurrence of an Event of Default, of those Court-approved professionals who have been retained before the occurrence of an Event of Default. (The amounts specified in clauses (a) and (b) including the limitations therein, collectively, constitute the "Carve-Out".) [Interim Order ¶ 12];

g. Application of Collateral Proceeds: All proceeds of Pre-Petition Collateral and DIP Collateral will be applied (a) first to the DIP Indebtedness until paid in full and (b) second to the Pre-Petition Indebtedness until paid in full in accordance with the Pre-Petition Loan Documents [Interim Order ¶ 16];

h. Releases and Validation of Claims: Subject to the rights of the Committee acting on behalf of the estates pursuant to paragraph 21 of the Interim Order, each of the Debtors and their estates will: (a) release the Agent, Senior Secured Parties, and Pre-Petition Lenders, together with their affiliates, agents, attorneys, officers, directors and employees, from any and all claims and causes of action arising out of or related to any of the Pre-Petition Loan Documents, any aspect of the pre-petition relationship between the parties, or any other acts or omissions by the Agent, Senior Secured Parties and Pre-Petition Lenders in connection with the Pre-Petition Loan Documents or their pre-petition relationship with any Debtor; (b) waive any and all defenses as to the validity, perfection, priority, enforceability and nonavoidability of the Pre-Petition Indebtedness and the liens on the Pre-Petition Collateral in favor of the Agent for the Senior Secured Parties and Pre-Petition Lenders; and (c) agree, without further Court order and without the need for the filing of any proof of claim, to the allowance of the pre-petition secured claims of the Agent, Lenders, Senior Term Lender, Junior Term Lenders and Term B Loan Lenders in the amounts and on the basis set forth in the Interim Order. [Interim Order ¶ 20.] Except as otherwise provided in the Stipulated Interim

Order, all of the provisions of the Interim Order, including the foregoing provisions relating to the Debtors' waiver and allowance with respect to certain claims, will be binding on all creditors and parties in interest; provided, however, the Committee will have until 45 days from the Petition Date to file on behalf of the Debtors objections or actions with respect to the claims and actions being released by the Debtors and/or the validity, extent, priority or enforceability of the Pre-Petition Indebtedness or pre-petition liens of the Pre-Petition Lenders in the Pre-Petition Collateral. [Interim Order ¶ 21];

i. <u>Covenant of Pre-Petition Lenders</u>: The Agent, on behalf of the Pre-Petition Lenders, has covenanted to not bring claims against pre-petition officers and directors of the Debtors arising from said individuals' pre-petition conduct in managing and directing the Debtors; provided, however, this covenant will not bar or limit any action by the Agent or any Pre-Petition Lender to claim, cross-claim or counterclaim with respect to any action or other proceeding that in the discretion of the Agent or such Pre-Petition Lender could affect the Agent's or such Pre-Petition Lender's claims or security interests against and in the Debtors and the property of their estates or could otherwise cause such Agent or Pre-Petition Lender to incur liability in any legal, equitable or other proceeding arising from or related to any of the Debtors, their affiliates, subsidiaries, officers, directors, agents, professionals or employees. [Interim Order ¶ 15];

j. <u>Automatic Stay</u>: With certain limitations, the automatic stay pursuant to Bankruptcy Code section 362 is vacated as to any of the Senior Secured Parties to permit them to exercise and enforce their rights and remedies pursuant to the Interim Order and DIP Credit Documents without further application to or order from the Court. The Agent is granted leave, among other things, on behalf of the Senior Secured Parties to (a) receive and apply payments to the Indebtedness from collections on and proceeds of the Pre-Petition Collateral and the DIP Collateral in the manner specified in the Interim Order and the DIP Credit Documents, (b) file or record any financing statements, mortgages or other instruments or other documents to evidence the security interests in and liens upon the DIP Collateral, (c) to charge and collect any interest, fees, costs, and expenses and other amounts accruing at any time under the DIP Credit Documents or the Interim Order as provided therein, (d) to give any Debtor any notice provided for in

any of the DIP Credit Documents or the Interim Order, and (e) upon the occurrence of an Event of Default or upon the Loan Payment Date, and without application to, or order from the Court or any other court, (i) terminate the Pre-Petition Credit Agreement and the Post-Petition Financing under the Interim Order and the other DIP Credit Documents, (ii) declare all Indebtedness immediately due and payable, and require that any letters of credit outstanding be cash collateralized or terminated without liability to the Senior Secured Parties in the manner provided in the DIP Credit Agreement, and (iii) revoke the Debtors' right, if any, under the Interim Order and/or the DIP Credit Documents to use cash collateral. Notwithstanding any of the foregoing, upon the occurrence of any Event of Default or upon the Loan Payment Date and three business days after the Agent has filed with the Court and served on counsel to the Debtors and Office of the United States Trustee a notice identifying any default under the Interim Order or Event of Default under the DIP Credit Documents, the automatic stay under Bankruptcy Code section 362 will be deemed vacated and modified with respect to the Senior Secured Parties for the purpose of exercising all of their rights and remedies under the Pre-Petition Loan Documents, the DIP Credit Documents, the Interim Order or applicable law. [Interim Order ¶ 10];

k.  Successors and Assigns: The provisions of the Interim Order shall be binding upon and inure to the benefit of the Lenders, the Agent, the Senior Secured Parties, the Pre-Petition Lenders, and the Debtors and their respective successors and assigns and any trustee hereinafter appointed [Interim Order ¶ 19]; and

(3)  scheduling of the Final Hearing on the Motion.

129.  The Interim Order further provides that:

a.  Interest, Fees and Expenses: The DIP Indebtedness will bear interest at the Agent's Base Rate plus 150 basis points, and the Pre-Petition Indebtedness will bear interest at the rate set forth in the Pre-Petition Credit Agreement. The Pre-Petition Lenders, Senior Secured Parties and Agent will be entitled to recover all of their reasonable attorneys' fees and other professional fees, as well as costs and expenses incurred in connection with the Indebtedness to the extent provided in the Pre-Petition Credit Agreement or DIP Credit Documents, as applicable. Further, the Agent and

Senior Secured Parties will be paid all fees specified in the DIP Credit Documents. [Interim Order ¶ 4]; and

b. Limitation on Use of Proceeds: The Cash Collateral and the proceeds under the Post-Petition Financing will be used to repay the Indebtedness5 and otherwise meet the obligations provided for in the Budget [Interim Order ¶¶ 3, 14, 16]. No proceeds of the Indebtedness or Cash Collateral nor any Pre-Petition Collateral or DIP Collateral (or proceeds thereof) may be used to pay any claims for services rendered by any of the Debtor's professionals, any other entity or the Committee's professionals in connection with the assertion of any claim, counterclaim, action, or proceeding, the purpose of which is to seek or the result of which would be to obtain any order, judgment, or similar relief (a) invalidating, avoiding or subordinating the Indebtedness or the liens and security interests of the Pre-Petition Lenders in the Pre-Petition Collateral or the Senior Secured Parties in the DIP Collateral; or (b) preventing or hindering the exercise by the Agent of any of its rights and remedies under the Pre-Petition Credit Agreement, the Pre-Petition Loan Documents, the Interim Order and/or the DIP Credit Documents or the Agents' enforcement of any of the liens on any Pre-Petition Collateral or DIP Collateral; provided, however, that the foregoing limitations will not apply to claims for services up to $20,000 rendered by the professionals retained by the Committee within 45 days of the Petition Date in connection with the investigation of the validity, priority, or enforceability of the Pre-Petition Indebtedness or any of the Pre-Petition Lenders' pre-petition liens and security interests in the Pre-Petition Collateral. [Interim Order, ¶ 12(b)].

130. At the Final Hearing, the Debtors seek entry of an order authorizing and approving the Postpetition Financing on a final basis pursuant to the Final Order. With respect to the Cross-Collateralization Provision, the Debtors seek approval thereof in connection with and as part of the Final Order, and is not seeking such relief on an interim basis. Further, if the

---

5 "Indebtedness" includes the DIP Indebtedness, the Pre-Petition Revolver Indebtedness, the Senior Term Lender Pre-Petition Indebtedness, the Junior Pre-Petition Indebtedness, and the Term Loan B Pre-Petition Indebtedness.

Senior Secured Parties and/or Pre-Petition Lenders so request, the Debtors shall seek as part of the Final Order a waiver of the right to surcharge under section 506(c) of the Bankruptcy Code.

131.    As required by Rule 4001 of the Federal Rules of Bankruptcy Procedure, the Debtors propose that the Court approve the Interim Order, pending notice of the Final Hearing date to be set by the Court, and that the Court enter the proposed Interim Order at the interim hearing and grant the relief sought hereby on a final basis and enter the Final Order at the final hearing.

132.    The Debtors have an urgent and immediate need for cash to continue to operate their business. The Debtors have elected to procure debtors in possession financing as the cash on hand and cash generated from operations is insufficient to meet the Debtors' payroll and other operating expenses, and to pay their vendors, professional fees and expenses, and other expenditures. The Debtors believe that the costs associated with a Debtors-in-possession credit facility are warranted and necessary under the circumstances and would, therefore, be beneficial to the Debtors' estates. Without immediate (and ongoing) financing and access to the cash in the Debtors' operating accounts and the cash to be collected after the Petition Date, the Debtors cannot pay current and ongoing operating expenses, including, without limitation, postpetition wages and salaries and necessary vendor products and services. Consequently, the Debtors will suffer irreparable harm, thereby jeopardizing any prospects for success in this case.

133.    The Debtors have not been able to obtain postpetition financing on an unsecured basis, pursuant to section 364(a) or (b) of the Bankruptcy Code. Similarly, the Debtors have sought, but have been unable to obtain, postpetition financing under section 364(c) of the Bankruptcy Code on terms preferable to the terms proposed by the Lender Group granting

to the Lender the superpriority status described in this Motion in accordance with section 364(c)(1) of the Bankruptcy Code, and secured by senior and junior liens under sections 364(c)(2) and (3), respectively.

134.    The Postpetition Financing primes existing liens against assets of the Debtors. The holders of the Supplemental Term Loans and the Angelo Gordon Loan, on information and belief, have consented to such priming.

135.    I believe that the entry of the Interim Order will help maintain employee, vendor and supplier confidence in the Debtors' ability to pay for goods sold and delivered and services rendered (including the extension of credit terms for the payments of goods and services) and continue their operations. The Debtors' borrowing also will be limited by the Budget agreed to with the Lender Group (and attached to the Interim Order as Exhibit A), providing additional safeguards for all creditors of the Debtors' estates. Accordingly, the Debtors request that the Court authorize the Debtors to borrow the loan proceeds on an interim and final basis.

136.    Based on the foregoing reasons, I submit that an order granting the relief requested in the above-referenced motion is in the best interests of the Debtors, their estates, their creditors and other parties-in-interest.

**Motions Filed to Seek Scheduling Hearings**

**P.      Motion For Order (A) Prohibiting Utilities From Discontinuing, Altering, Or Refusing Service; And (B) Establishing Procedure For Determining Adequate Assurances of Payment**

137.    The Debtors are requesting entry of an order (i) prohibiting their utility companies (the "Utility Companies") from altering, refusing, or discontinuing services; and

(ii) establishing procedures for determining requests adequate assurances of payment for future utility services.[6]

138.     In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, gas, water, telephone, telecommunications, and similar services (collectively, the "Utility Services") from many different utility companies and telecommunications vendors throughout the United States (the "Utility Providers"). Annexed to the Motion as Exhibit A is a list of substantially all of the Utility Providers that provide Utility Services to the Debtors as of the Petition Date. Neither the omission from or inclusion in Exhibit A is dispositive as to whether a particular party is or is not a utility company, but simply represents the Debtors' current belief as to the status of such party. The relief requested by this Motion is requested with respect to all Utility Providers and is not limited to only those identified on Exhibit A.

139.     The Debtors further request that the Order provide that:

a.     The Utility Providers are forbidden to discontinue, alter or refuse service on account of any unpaid prepetition charges, or request payment of a deposit or receipt of other security in connection with any unpaid prepetition charges without further order of this Court except as otherwise provided in this Motion;

b.     The Debtors will serve the Order on the Utility Providers via U.S. Mail, within five (5) business days of the date the Order is entered by the Court (the "Date of Entry");

c.     A Utility Provider may request additional assurance of payment in the form of deposits or other security within thirty (30) days of the Date of Entry (an "Additional Assurance Request") and, if the Debtors believe the Additional Assurance Request is unreasonable, the Debtors will promptly schedule a hearing to determine if additional assurance is necessary (the "Determination Hearing");

---

[6] Although the Debtor believes that the list of Utility Providers attached as Exhibit A to the Motion is a complete list, they reserve the right, without further order of the Court, to supplement the list if any Utility Provider has been omitted.

> d. Any Additional Assurance Request must (i) be made in writing and (ii) must include a summary of the Debtors' payment history relevant to the affected account(s);
>
> e. Pending resolution of any such Determination Hearing, any Utility Provider making an Additional Assurance Request shall be prohibited from discontinuing, altering or refusing service to the Debtors on account of unpaid charges for prepetition services;
>
> f. A Utility Provider shall be deemed to have adequate assurance of payment until a future order of this Court is entered in connection with a Determination Hearing; and
>
> g. If a Utility Provider makes an Additional Assurance Request that the Debtors believe is reasonable, then the Debtors shall be entitled to comply with such request, as described in the Motion, without further order of the Court.

140. The Debtors submit that granting the relief requested is both necessary and appropriate pursuant to sections 105 and 366 of the Bankruptcy Code. The Utility Providers will be adequately protected with respect to the provision of Utility Services after the Petition Date. The Debtors are concurrently seeking authority to obtain debtor in possession financing to sustain operations during the pendency of the orderly liquidation of the Debtors' assets. Similarly, the Debtors are seeking authority to retain liquidation consultants to conduct going-out-of-business sales at the Debtors' retail locations pursuant to an agreement under which the liquidation consultants will reimburse the Debtors' estates for occupancy costs incurred during the liquidation, which occupancy costs include those in connection with Utility Services. Moreover, the Utility Providers will be afforded administrative expense treatment on account of postpetition utility claims. If Utility Providers require deposits to secure continued postpetition services or if those Utility Providers who did not require deposits prepetition now require deposits to secure continued services, the Debtors could face severe cash drains. This harm to the Debtors is particularly unnecessary under the current circumstances because, pursuant to

their proposed postpetition financing and the commitment from the liquidation consultant to

reimburse the Debtors for such costs, the Debtors have sufficient funds to pay for postpetition

utility services as the come due. Under the circumstances, this Court should grant the relief

requested in the Motion.

**Q.      Motion for Entry of an Order (A) Authorizing the Debtors to
          Conduct Going-Out-Of-Business Sales Pursuant to Section 363 of
          the Bankruptcy Code, (B) Approving Termination Fee and the Terms
          and Conditions of Auction, (C) Authorizing the Debtors to Enter Into
          Agency Agreement for Liquidation of Merchandise that Grants the Agent
          a Lien in the Merchandise Pursuant to Section 364 of the Bankruptcy Code,
          and (D) Fixing Manner and Extent of Notice**

### Store Closing Decision

141.    As discussed above, the Debtors have been unable to secure financing to

enable them to continue operating their businesses as a going concern. Accordingly, the Debtors

have determined that it is in the best interests of the Debtors' estates to cease operations at all of

their locations (collectively, the "Closing Locations ). The Debtors believe that maximum value

can best be achieved through the conduct of the store closing, going-out-of business and similar

theme sales from the Closing Locations (the "Store Closing Sales"), with the assistance of agents

experienced in the conduct of such sales.

### Summary of Motion

142.    By this Motion, the Debtors seek an order authorizing the Debtors to (a)

cease business operations at the Closing Locations; (b) conduct the Store Closing Sales, (c)

schedule and conduct an auction for a liquidating agent in accordance with the bid procedures

attached as **Exhibit 1** (the "Bid Procedures") to the proposed order approving such procedures

(the "Proposed Procedures Order"), which Order is attached as **Exhibit A** to the Motion, (d)

enter into an agency agreement with a joint venture comprised of SB Capital Group, LLC, Tiger Capital Group, LLC, and The Ozer Group LLC (collectively, the "Selected Bidder"), a copy of which is attached as **Exhibit E** to the Motion (the "Selected Agency Agreement"), or otherwise enter into an agency agreement with the successful bidder at the auction, and (e) pay a termination fee to the Selected Bidder of $500,000, as provided in the Selected Agency Agreement.

A.    <u>The Proposal for Sales of Assets And Store Closings</u>

143.    The Debtors seek authority to conduct the Store Closing Sales in order to liquidate the Debtors' merchandise inventory ("Inventory"), furniture, equipment and trade fixtures ("FF&E"), and other assets located at each of the Closing Locations (collectively, the "Assets").[7] The Debtors reserve the right to close one or more of the Closing Locations and/or transfer the Inventory in such Closing Locations or the Debtors' Distribution Centers to other locations and/or to relocate or warehouse some or all of the FF&E and other assets.

144.    The Debtors contemplate, and request authority to conduct, the Store Closing Sales consistent with a series of store closing and going-out-of-business guidelines (the "Guidelines") which are annexed as **Exhibit D** to the Motion.

145.    In addition, the Debtors seek authority for themselves (and/or their agent) (a) to administer the Store Closing Sales without complying with (i) any applicable state and local statutes, rules or ordinances governing liquidation or "going-out-of-business" sales (the "Local Laws"), including, without limitation, Local Laws related to bulk sale laws, advertising,

---

[7] By separate motion, the Debtors are seeking authority to retain Keen Realty LLC to act as their exclusive agent for the purposes of generating value from the Debtors' non-residential real property leases.

licensing requirements and procedures, waiting periods or time limits, inventory augmentation and transferring merchandise between Closing Locations; provided, however, that the Debtors and/or the Agent continue to be bound by and comply with the state and local public health and safety laws ("'Safety Laws"), and tax, labor, employment, environmental, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, the "General Laws"), to the extent applicable; provided further, however, that the Debtors (and/or their agent) shall comply with the Guidelines, (ii) any court order or other decree of any federal, state or local governmental authority or regulatory body that would impair, or is required for the Debtors' consummation of the transactions contemplated hereby, or (ii) any contract or other agreement to which Debtors are a party or by which the Debtors are otherwise bound that would prevent or impair the consummation of the Store Closing Sales and/or the other transactions contemplated hereby; (b) to sell the Assets at the Store Closing Sales free and clear of all liens, claims and interests pursuant to section 363(f) of the Bankruptcy Code, with liens to attach to the proceeds of sale in the same priority as such liens had against the property sold and with any buyer to be afforded all of the protections afforded by section 363(m) of the Bankruptcy Code; (c) to grant the Selected Bidder or other successful bidder at the auction a lien in the Assets to secure payments to such liquidator; and (d) to sell the Assets free from any warranties, except that the Debtors will, to the extent legally permissible, pass on all manufacturer's warranties to customers.

146.    The Debtors further seek to conduct the Store Closing Sales notwithstanding any provisions in the Debtors' non-residential leases with third parties which purport to restrict the debtors' ability to do so, including any "going dark" provisions.

147.    Furthermore, the Debtors seek authority to abandon as inconsequential any fixture, fixtures, equipment or other items of personal property remaining in the leased premises for the Closing Locations as of the effective dates of the rejection of such leases, unless the lessors previously have been notified in writing to the contrary at least three (3) days prior to the effective date of rejection of such leases.

148.    To initiate the Store Closing Sale process, the Debtors also seek this Court's approval of the Debtors' conduct of an auction (the "Auction") and an overbidding procedure to be used at the Auction to determine the liquidating agent to be retained by the Debtors to conduct the Store Closing Sales (the "Liquidating Agent").

149.    Accordingly, the Debtors request authority to enter into the Selected Agency Agreement or otherwise, if applicable, an agency agreement with the successful bidder at the Auction and to pay a $500,000 termination fee to the Selected Bidder in the event of a successful overbid at the Auction (the "Termination Fee") under the terms and conditions set forth in the Selected Agency Agreement, which includes a component to reimburse expenses incurred by the Selected Bidder in preparation for the Store Closing Sales or in the formation of the Selected Agency Agreement.

150.    The realization of fair value for the Assets as promptly as possible will inure to the benefit of all parties' interest.  Therefore, the Debtors propose to conduct Store Closing Sales at the Closing Locations, by and through the Liquidating Agent, immediately upon entry of an order by this Court granting the relief requested in this Motion.

**B.**     **The Debtors' Decision to Close the Closing Locations and Conduct**
          **Store Closing Sales**

          151.    In the Debtors' business judgment , the relief sought will maximize the
Debtors' recovery on its assets and, therefore, is in the best interest of the estates and their
creditors.

          152.    As discussed above, the Debtors have no alternative but to cease
operations and conduct an orderly liquidation of their assets because they have been unable to
locate financing to enable them to sustain operations as a going concern. Accordingly, the
Debtors' decision to close the Closing Locations and conduct going-out-of-business sales is an
exercise of sound business judgment.

          153.    The Debtors hereby seek authority to sell any, some or all of the Assets at
the Store Closing Sales as set forth herein.

**C.**     **Sales Free and Clear of All Liens**

          154.    The Debtors propose that all Assets sold in the Store Closing Sales be sold
free and clear of all liens, claims and encumbrances (the "Liens"). To the extent that there are
any creditors that assert a security interest in the Assets, the Debtors believe that they will obtain
their consent to the sale of such Assets free and clear of Liens. The Debtors intend to serve
notice of this Motion on all parties who filed UCC financing statements encumbering any portion
of the Debtors' assets. If a creditor with an alleged Lien does not object to the relief requested in
this Motion, such failure to object may be deemed consent under section 363(f) of the
Bankruptcy Code. Moreover, the Debtors request that the Liens asserted against the affected
Assets by any creditor purporting to be a secured creditor be transferred and attached to the net

proceeds, in the same order and priority and with the same validity as they now have against the Assets, received by the Debtors from the particular Store Closing Sale against which the Lien is alleged, subject to the rights, claims, defenses and objections, if any, of any and all interested parties with respect thereto.

155. The Debtors also propose that they be authorized to sell the Assets free from any warranties, except that the Debtors will, to the extent legally permissible, pass on all manufacturers' warranties to customers.

## D. Proposed Authority to Retain a Liquidating Agent

156. The Debtors propose to dispose of the Assets substantially in accordance with the terms of the Selected Agency Agreement. A summary of the most pertinent terms and conditions of the proposed Selected Agency Agreement is as follows:[8]

Sale; Agency: Pursuant to the Selected Agency Agreement, the Debtors will employ the Selected Bidder to act as the Debtors' exclusive agent for Assets located in the Stores and the distribution centers by means of a promotional, store closing, going out of business, or similar liquidation sale.

Guaranteed Amount: In consideration for the Debtors' entering into the Selected Agency Agreement, and irrespective of the actual proceeds of the sale, the Selected Bidder is obligated to pay to 81.5% of the aggregate Cost Value of the Assets (the "Guaranteed Amount"). The Selected Agency Agreement assumes that the Cost Value of Assets is not more than $76 million, and not less than $69 million. In the event there is a deviation form these inventory levels, the Agreement contemplates an adjustment to the guaranteed percentage to be paid by Selected Bidder.

Expenses of Sale: In addition to payment of the Guaranteed Amount, and irrespective of the sufficiency of proceeds, the Selected Bidder is also responsible for the payment of all expenses of conducting the sale, including, without limitation, a base payroll of the Debtors' employees used by the Selected Bidder in connection with the sale, and all occupancy expenses associated with the stores and distribution centers.

---

[8] All terms in this summary not defined in the Motion shall have the same meaning as in the Selected Agency Agreement. In the event of any conflict between this summary and the Selected Agency Agreement, the terms of the Selected Agency Agreement shall control.

Additional Recovery: To the extent that proceeds exceed the sum of (x) the Guaranteed Amount, (y) expenses of the sale and (z) 4% of the aggregate cost value of inventory and any augmentation merchandise (the sum of (x), (y) and (z), the "Sharing Threshold"), then all remaining proceeds of the sale above the Sharing Threshold shall be shared between 66.66% to the Debtors and 33.33% to the Agent, depending on the ultimate success of the sale. (The Debtors' share of such additional Proceeds shall be referred to as the "Recovery Amount.") In addition to the Guaranteed Amount and Minimum Additional Return, Selected Bidder also guarantees that the Debtors shall receive the greater of (a) the Recovery Amount, (b) 4% from the net proceeds from the sale of the Additional Merchandise (less the Minimum Additional Return which was advanced against such amount) (the "Additional Merchandise Fee") or (c) the Minimum Additional Return.).

Sale Term: The sales will commence at the stores no later than July 30, 2004, and end at all stores no later than October 31, 2004, unless an extension is otherwise mutually agreed upon by the Debtor and the Agent. The Agent may, in its discretion, terminate the sale at any Store upon not less than ten (10) days' prior written notice to the Debtor.

FF&E: The Agent also has the right to sell the FF&E owned by the Debtor (and not any FF&E owned by third parties) for a commission, net of the costs of sale of the FF&E, of 20%. This is a highly favorable commission for the Debtors' estates as it is net of expenses.

Customer Deposits/Orders: The Debtors have negotiated a comprehensive series of procedures with the Selected Bidder under which the Selected Bidder shall assist the Debtors in fulfilling as many of the Debtors' outstanding customer orders as practicable. Without this service, the Debtors do not have any capacity to procure the merchandise necessary to complete these outstanding orders. An important aspect of the Selected Agency Agreement is the Selected Bidder's agreement to assist the Debtors in filling outstanding customer orders for which a deposit was made prepetition. Section 3.6 of the Selected Agency Agreement also has a financing provision whereby the Selected Bidder is entitled to a first priority and senior lien in and to the completed Back Order Fulfillment Merchandise, Back Order Fulfillment Orders and the Back Order Fulfillment Proceeds pursuant to section 364(d) of the Bankruptcy Code, and to a super-priority claim senior to all other claims pursuant to section 507(b) of the Bankruptcy Code, in each case to the extent of the amount of the Agent Funding and the Agent's Fulfillment Fees.

Augmentation: The Selected Bidder's agreement to enter into the agreement and pay the Guaranteed Amount is subject to the Debtors' ability to obtain this Court's approval of Selected Bidder's inclusion in the sale of additional merchandise procured by Selected Bidder, of a ceiling of not more than

$35 million aggregate cost value.[9] The subject additional merchandise (including rugs and wall coverings) shall in all respects be of like kind and quality as the merchandise ordinarily sold in the stores by the Debtors. In consideration of the Debtors' agreement with regard to the additional merchandise, the Selected Bidder has agreed to (i) assist the Debtors in fulfilling as many of the Debtors' outstanding customer orders as practicable and (ii) pay the Debtors' estate a guaranteed minimum return of $2.0 million.

Physical Inventory Taking: The Debtors and the Selected Bidder have agreed that the parties shall conduct a comprehensive physical inventory to determine the aggregate cost value of the merchandise to be included in the sale. In the course of such negotiations, the Debtors have been granted the option, at their election, to accept a "global adjustment" in lieu of piece-by-piece negotiations over value adjustments to damaged and/or defective merchandise. If the Debtors make this global adjustment election as per the Selected Agency Agreement, the aggregate cost value of the merchandise shall be reduced by a sum equal to 7%. This global adjustment mechanism is a significant benefit to the Debtors, and serves to protect the estates' downside from the inventory taking.

Break-Up Fee; Overbid Protection: The Debtors have agreed, subject to Court approval under the Procedures Order, to pay the Selected Bidder a break-up fee in the amount of $500,000, reduced from the Selected Bidder's original request of $750,000. In addition, the parties have agreed to grant the Selected Bidder limited overbid protection by requiring that any competing offer exceed the Selected Bidder's offer by not less than a 1% increase in the Guaranteed Amount, with all successive bid thereafter being in increments of not less than 0.25% higher than the prior bid.

157.   In the exercise of their business judgment the Debtors believe that they can expedite the Store Closing Sales and maximize the return from the Assets by conducting an open Auction and soliciting offers from competing bidders who wish to liquidate the Assets. Accordingly, the Debtors seek authority to dispose of the Assets under the terms of the Selected Agency Agreement though the Selected Bidder, or an alternative liquidating agent who submits a higher and better bid at the Auction.

---

9  The Debtors will choose the Liquidating Agent at the Auction based on the best offer, which could possibly result in a higher ceiling on the augmented Inventory. Thus, it is possible that the Debtors will be requesting a higher ceiling for the augmented Inventory.

158. Proceeding in this fashion will provide the Debtors with several benefits. First, allowing a professional liquidator to liquidate the Assets though promotional going-out-of-business sales will enable the Debtors to maximize sale proceeds for the Assets. Second, it is more cost effective for the Debtors to allow a liquidation agent to conduct the Store Closing Sales than to conduct such sales on their own. Such liquidation agents generally have extensive knowledge, expertise and experience in conducting store closing sales. Therefore, the Debtors' decision to retain Selected Bidder, or an alternative liquidating agent selected at the Auction to conduct the Store Closing Sales is an exercise of sound business judgment.

159. The Selected Bidder does not have any interests with respect to this transaction which are materially adverse to those of the Debtors, their estates, or other creditors. The Debtors will insure the same will be true of any party participating at the Auction. Additionally, the Debtors submit, and will demonstrate at the hearing on this Motion, that any such prevailing bidder is entitled to the protections of section 363(m) of the Bankruptcy Code, as the Agency Agreement will be the product of a good faith, arm's-length transaction.

160. Pursuant to the arrangement proposed herein, the Liquidating Agent will have the right to use the Closing Locations and the Debtors' related services, FF&E and other assets located in the Closing Locations in conducting the Store Closing Sales. In addition, pursuant to the Agency Agreement, the Liquidating Agent will also have a limited license to use the Debtors' trade names, logos and customer lists related to and used in connection with the operation of the Closing Locations, solely for the purpose of advertising the Store Closing Sales.

161. In addition to seeking authority to sell the Inventory though the Store Closing Sales pursuant to the Selected Agency Agreement, the Debtors also seek authority to

permit the Agent to augment the Inventory with like-kind goods, with the Debtors to receive a fee equal to a certain percentage of the gross sale proceeds realized from the sale of such merchandise as described in Section 3.1(a)(ii) of the Selected Agency Agreement.

E.     **The Terms of the Selected Agency Agreement**

162.     During the last two weeks the Debtors contacted several large national liquidators to seek their interest in conducting the Store Closing Sales on the Debtors' behalf. The Debtors requested that such liquidators submit proposals to the Debtors regarding the terms and conditions upon which they were interested in conducting such Store Closing Sales. On July 6, 2004, the Debtors received three (3) separate proposals, which they immediately shared with representatives of the Lender Group and Angelo Gordon. Two of the proposals contemplated a straight liquidation of the Assets. One proposal contemplated a combined bid for the Assets and the Debtors' retail leases. The Debtors, after consultation with the Lender Group and Angelo Gordon, determined that pursuit of the two bids which contemplated liquidation of the Assets and not the real estate leases was appropriate. Accordingly, during the week of July 6, 2004, the Debtors and their representatives, after consultation with the Lender Group and Angelo Gordon, negotiated with several parties in an attempt to generate the most economically advantageous terms for the Debtors' estates. The results of that process is the Selected Agency Agreement negotiated with the Selected Bidder.

163.     Accordingly, the Debtors determined that the offer from the Selected Bidder was sufficiently high and otherwise beneficial to the Debtors to serve as a starting point for the Auction. In connection with such negotiations, the Debtors believe that it was desirable and in the best interests of the Debtors to induce the Selected Bidder to enter into the Selected

Agency Agreement by providing that the Termination Fee be paid to the Selected Bidder in the event of a successful overbid at the Auction. The Selected Agency Agreement negotiated with the Selected Bidder shall serve as the basis upon which interested bidders shall bid at the Auction. The Debtors are finalizing the negotiation of the Selected Agency Agreement and, as such, the terms and conditions of the Selected Agency Agreement are subject to further modification. A true and correct copy of the Selected Agency Agreement is attached to the proposed Order (**Exhibit B** to the Motion) approving the Store Closing Sales and the Agency Agreement as **Exhibit A**. Parties are referred to the Selected Agency Agreement or the proposed terms and conditions of the engagement of the Selected Bidder. In the Debtors' view, the terms of the Selected Agency Agreement are fair and reasonable and comparable to terms of similar agreements in comparable liquidation sales.

164.    The Selected Agency Agreement requires that the Debtors seek and obtain Court approval of the Agreement and authorization to conduct the Store Closing Sales.

## F.    Bid Solicitation and Auction Procedures

165.    If authorized to do so, the Debtors propose to circulate the Selected Agency Agreement to potential bidders at or before the Auction and invite them to attend the Auction, which is proposed to be held at the offices of Pachulski, Stang, Ziehl, Young, Jones & Weintraub, P.C., 919 North Market Street, 16th Floor, Wilmington, DE 19899 no later than July 29, 2004 or at such earlier date the Court so provides. At the Auction, the Debtors shall entertain, receive and consider any and all additional higher and better proposals (as compared to the proposals set forth in the Selected Agency Agreement) as may be presented by any qualified bidders. In the event that a party submits a qualifying and acceptable bid to the Debtors at the

Auction, the Debtors request that the Court hold a hearing on the same date as the Auction to consider approval of the Debtors' engagement of an exclusive Liquidating Agent to assist the Debtors in the conduct of the Store Closing Sales, which sales the Debtors request be authorized and approved under section 363 of the Bankruptcy Code.

166.   The Debtors propose to conduct the Auction on the terms and conditions set forth in the materials included with the Selected Agency Agreement, including the Bidding Procedures, which will be distributed to potential bidders for the Assets (the Selected Agency Agreement and the materials included therewith shall be referred to as the "Solicitation", a copy of which is attached to the Proposed Procedures Order as Exhibit 2). The Solicitation provides, among other things, that the Auction will be conducted on the following terms and conditions: [10]

(a)     Bids must be presented as a guaranteed recovery percentage based upon the aggregate cost value of the Debtors' Inventory located in the Closing Locations, together with any additional consideration that a bidder may, in its discretion propose (each a "Qualifying Bid") and shall specifically identify any modifications or addition of provisions to the Selected Agency Agreement.

(b)     Each bid must be accompanied by a $250,000 bid deposit and certain information sufficient, in the Debtors' discretion, to demonstrate that the bidder has the financial wherewithal to consummate the transaction represented by its bid. All bidders shall be required to post Letters of Credit to secure its reimbursement obligations under the Selected Agency Agreement and the obligation to pay the remaining amounts due the Debtors after the completion of the final inventory reconciliation.

(c)     At the Auction, the Debtors will entertain bids from the qualifying bidders, with the first bid or combination of bids being required, in the aggregate, to be for an amount equal to not less than one percent (1.0%) higher than the Selected Bidder' bid, with each successive bid being in increments of not less than one-quarter percent (0.25 %) higher than the previous bid. At the conclusion of the Auction, the Debtors shall determine in their sole discretion which of the bids received at the Auction is the highest and best offer received, following which the Debtors shall make a recommendation to the Court. Notwithstanding the foregoing, the Debtors reserve the right to evaluate all other bids received and may determine that such bids are of higher and better value even if it does not conform to the structure of the bid set forth in the Selected Agency Agreement.

---

[10] The following summary is subject in all respects to the more detailed term and conditions set forth in the Solicitation, which is incorporated herein by reference.

167.    All offers submitted at the Auction shall be required to remain open and irrevocable until after the conclusion of the hearing on the Motion.

168.    Unless otherwise agreed by the Debtors, all offers must be all cash and not subject to any financing contingencies.

169.    The Debtors believe that good cause exists to approve the terms and conditions of the Auction in the form of the Solicitation. The terms and conditions of the Auction are reasonable and will enable the Debtors and their creditors to realize the maximum value from the Assets. The Debtors believe that the bidding process will yield the highest and best bids for the Assets.

170.    The Debtors therefore request that the Court approve the terms, conditions and notice of the Auction, and authorize the Debtors to conduct the Auction pursuant to the terms and conditions of the Solicitation.

## G.    Leasehold Provisions Restricting Liquidation Sales

171.    Certain of the leases governing the Closing Locations may contain provisions purporting to restrict or prohibit the Debtors from "going dark" or conducting going-out-of-business, store closing, liquidation or similar sales at the Closing Locations. I am advised by counsel that these provisions are unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to maximize the value of its assets under section 363 of the Bankruptcy Code.

172.    Accordingly, no clause in any of the leases should act as an impediment to the Store Closing Sales or any activities connected with them. To the extent that they exist, the Debtors request that the Court grant to the Debtors authority to conduct the Store Closing Sales

without complying with such restrictive lease provisions and enjoin the lessors from interfering with or otherwise restricting the Debtors from conducting the Store Closing Sales seeking to recover damages for breach of the restrictive provisions.

173.    As such, to the extent that such provisions or restrictions exist in any of the Debtors' leases, the lessors may not interfere with or otherwise seek to restrict the Debtors from conducting the Store Closing Sales.  Accordingly, the Debtors request that the Court authorize the Debtors to conduct the Store Closing Sales notwithstanding any such provisions or restrictions in such leases.

### H.    State and Local Laws Restricting Store Closing Sales

174.    The Debtors seek authority to conduct the Store Closing Sales (a) notwithstanding any provisions in the leases of the Closing Locations restricting the Debtors' ability to conduct "going-out-of-business" sales, and (b) without complying with any Local Laws, including, without limitation, Local Laws related to bulk sale laws, advertising, licensing requirements and procedures, waiting periods or time limits, inventory augmentation and transferring merchandise between Closing Locations; provided, however, that the Debtors and/or the Agent continue to be bound by and comply with the Safety Laws and the General Laws, to the extent applicable; provided further, however, that the Debtors (and/or their agent) shall comply with the Guidelines, which are annexed to the Motion as **Exhibit D.**  In the Debtors' business judgment, the relief sought will maximize the Debtors' recovery on the Assets and, therefore, is in the best interests of the estates and their creditors.

## I.    Abandonment of Inconsequential Property

175.    During the course of the Store Closing Sales, the Debtors may determine that the costs associated with holding and/or selling certain property exceed the likely proceeds that may be realized upon its sale. As such, the property is of inconsequential value and benefit to the Debtors' estates and may, in certain cases, be burdensome to the Debtors' estates. To maximize the value of the Debtors' estates to be realized in connection with the Store Closing Sales, the Debtors request authority under section 554(a) of the Bankruptcy Code to abandon such property which the Debtors, in the exercise of their business judgment, determine to be burdensome, or of inconsequential value and benefit to the Debtors' estates.

## J.    The Termination Fee Provisions of the Selected Agency Agreement

176.    In light of the current environment in the retail industry and certain chapter 11 cases in that industry, the Debtors determined that the promise of the Termination Fee would stimulate bidding and, coupled with the other Bid Procedures contained in the Solicitation, stimulate bidding.

177.    Moreover, the Termination Fee is modest, particularly in light of the expected value to be derived from the sale of the Assets.

178.    Accordingly, the Debtors submit that the proposed Bidding Procedures, including the Termination Fee, are an exercise of their sound business judgment. The procedures are necessary to encourage initial bidders to come forward with their best offers. Without these procedures, the Debtors may be unable to maximize the value they can receive for these assets because potential bidders would be discouraged from submitting their best bids.

**R. Motion For Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code Authorizing and Approving Implementation of Key Personnel Retention Program**

179.   As discussed above, the Debtors' inability to secure financing to enable them to continue operating their businesses as a going concern left the Debtors with no other choice than to conduct an orderly liquidation of their assets. The Debtors intend to conduct going-out-of-business sales at their business locations and dispose of their other assets in a manner designed to maximize value for stakeholders. Accordingly, the Debtors have filed separately a motion seeking Court approval of certain GOB sale procedures, authorization to enter into an agency agreement with a liquidator firm, and other related relief. Pending the orderly liquidation of the Debtors' assets and the wind-down of the Debtors' remaining operations, it is imperative that the Debtors' key management and other personnel remain in place during this relatively short, but critical, stage of the Debtors' businesses in order to facilitate the liquidation and wind-down process and ensure that it is conducted in an orderly, efficient and effective manner.

### Description of Proposed Retention Program

180.   To that end, the Debtors have developed the Retention Program, which is comprised of a salary-multiple-based component and a discretionary component. The Retention Program offers incentive stay bonuses ("Stay Bonuses") to approximately 117 Key Personnel, including certain executives, operations directors, managers, supervisors, assistants and other employees, in 11 departments or segments of the Debtors' operations[11]:

---

[11] The Debtors contemplate that their liquidation consultant might offer stay bonuses to certain store level employees. However, any such stay bonuses will be paid by the liquidators from their own funds and not deplete the Debtors' assets.

| Department/Facility | Estimated Number of Eligible Employees | Estimated Potential Total Cost (assuming all retention payments made) |
|---|---|---|
| Office of the Chairman | 2 | $170,800 |
| Regional Administrators | 6 | $33,700 |
| Human Resources | 17 | $219,700 |
| Logistics | 4 | $11,500 |
| Distribution Center – New Holland, Delaware and Linden | 34 | $44,200 |
| Distribution Center – Milford and Breuners | 17 | $26,700 |
| Finance Department | 10 | $339,100 |
| Store & Operations Controller Departments | 13 | $93,100 |
| Merchandising | 2 | $20,100 |
| Merchandising Services, Parts & Marketing | 6 | $15,400 |
| MIS | 6 | $121,500 |
| Total: | 117 | $1,095,800 |
| Discretionary Bonus (discussed below): | | $50,000 |
| Total: | | $1,145,800 |

181.    Under the Retention Program, the Key Personnel are eligible to receive

Stay Bonuses based on a salary multiple, for each week of service rendered post-petition.

Specifically, the Stay Bonuses are determined based on a multiple or percentage (with several

exceptions, ranging from 25% to 100%) of the applicable Key Personnel's current weekly

salary12; for example, assuming a Stay Bonus multiple of 50% (0.50), an employee earning a

$1,200 weekly salary, providing one week of post-petition service, would be entitled to a $600

Stay Bonus.13  The following table reflects the weekly salary multiplier based on title or grade

level of the eligible employee:

---

[12]  With respect to employees paid on an hourly basis who are eligible for bonuses under the Retention Program,
such employees' weekly compensation amounts were computed based on total work hours in a full work week.
[13]  Generally, pursuant to their established employment practices and guidelines, the Debtors review and increase, if
appropriate, salaried employees' salaries every two years (as of the relevant employees' employment anniversaries)
and hourly employees' compensation annually.  Based on a review of the Debtors' records, of all 117 employees
eligible for Stay Bonuses under the proposed Retention Program, only one employee received a salary increase
during calendar year 2004 and such increase (effective as of early January 2004) was reviewed and approved by the
Debtors in the ordinary course of business.

| Position | Weekly Salary Multiplier (for Stay Bonus Calculation) |
|---|---|
| CEO | 4[14] |
| Executive Vice President | 2 |
| Vice President / Director / Manager | 1 |
| Supervisor | 0.50 |
| All Others | 0.25 |

Stay Bonuses will accrue on a weekly basis and will generally be paid in single lump sum cash

payments on the "Trigger Date", which shall be the date upon which the Debtors terminate the

employee without cause.[15] An employee shall not be entitled to receive a Stay Bonus if they

terminate their employment prior to the date they are terminated by the Debtors or if they are

terminated for cause. Similarly, an employee may only receive a Stay Bonus if they execute a

release relinquishing any rights to any other retention, severance, termination and/or similar

benefits or claims that may be available under the Union Agreements, Executive Employment

Contracts, the Worker Adjustment and Retraining Notification (WARN) Act (federal and/or

comparable state statutes, if applicable), and/or any other preexisting agreement or arrangement

---

[14] The Debtors anticipate that the CEO, Mr. Reddington, will continue to serve the Debtors for approximately four weeks after the Petition Date, in which case he would be entitled to a maximum Stay Bonus of approximately $170,000.

15 Rather than receiving his entire Stay Bonus on the Trigger Date, the Debtors' CEO, Mr. G. Joseph Reddington, will be entitled to receive his bonus in two equal (50%) installments, with the first 50% payable on the Trigger Date and the second 50% installment payable upon the Lender Group receiving the second installment payment of sale proceeds from the Debtors' liquidating agents (pursuant to the parties' agency agreement and/or other related agreements and documents) (the "Second Payment Date") (currently, the Debtors anticipate the Second Payment Date to occur on or about October 1, 2004). Notwithstanding any of the foregoing, in order for Mr. Reddington to be entitled to the second 50% installment of his Stay Bonus, the Debtors' Board of Directors (the "Board") must have determined that he performed in good faith and made his best efforts in his duties as CEO from the Petition Date to the Trigger Date in maximizing the value of the estates and in connection therewith, *inter alia*, negotiating with the Debtors' trade vendors, the credit card company vendors, the liquidators, and any parties who may express interest in purchasing the Debtors or their assets as a going concern. Similarly, under the proposed Retention Program, the Debtors' CFO, Michael Brown, will be entitled to receive his Stay Bonus on the Trigger Date, provided, however, that 50% of his Stay Bonus shall be dependent upon a determination of the Board that he performed in good faith and made his best efforts in his duties as CFO from the Petition Date to the Trigger Date in maximizing the value of the estates and in connection therewith, *inter alia*, managing the Debtors' customer deposit and liquidation process.

(see discussion in the next paragraph). The Debtors intend to provide eligible employees with the target dates for their anticipated termination. While the Debtors believe their projections and plans regarding employees' anticipated lengths of service are as accurate as possible, the projected durations of service may have to be extended (or reduced) in some cases as these bankruptcy proceedings progress. Eligible employees will be notified by the Debtors within a reasonable time frame of any changes to the employee's projected length of service.

182.    The Debtors do not have any preexisting retention and/or severance plans or policies, other than (i) any retention, severance or termination benefits that may be provided for under the Debtors' collective bargaining and/or other agreements with the Unions ("Union Agreements") and (ii) severance benefits under the Debtors' employment contracts with six senior executives, including the CEO ("Executive Employment Contracts"). As noted above, in order to receive a Stay Bonus, each eligible employee must expressly waive and relinquish any and all other retention, severance, termination and/or similar benefits that may available under the Union Agreements or Employment Contracts, as applicable, or any other preexisting agreement or arrangement. The Debtors do not seek by this Motion any determination with respect to any of the Debtors' obligations under the Union Agreements that are not expressly waived by applicable Key Personnel or covering employees who are not included in the Retention Program; the Debtors reserve all their rights with respect to the Union Agreements. With regard to the Executive Employment Contracts, provided that each applicable executive waives his or her retention and severance benefits otherwise available thereunder, the Debtors may in fact save some resources by implementing the Retention Program. The CEO's Executive Employment Contract provides for one year's severance, while the other Executive Employment

Contracts provide for six months' severance. The potential Stay Bonuses for these executives under the Retention Program are substantially less than these contractual benefits; for example, in lieu of one year's severance (over $550,000), the estimated Stay Bonus for the CEO under the Retention Program is approximately $170,000). While the relative priority of any claims under the Executive Employment Contracts may be the subject of dispute, implementation of the Retention Program as to such individuals will avoid time and expense and uncertainty relating to the interpretation and effect of the Executive Employment Contracts.

183.    In addition to the salary-multiple-based Stay Bonuses, under the Retention Program, the Debtors will also establish a $50,000 fund for payment of discretionary bonuses to Key Personnel and/or other employees who may not be eligible for Stay Bonuses under the Retention Program. The Debtors will in their sole discretion offer and award additional bonuses to such employees in order to induce them to achieve certain results for maximum recovery to the estates.

184.    Assuming that all of the Key Personnel continue to provide services to the Debtors for their respective anticipated duration of service, the Debtors estimate that the aggregate cost of the Retention Program will be approximately $1.15 million. Because for certain eligible employees, the expected length of postpetition service is several months or longer, the approximately $1.15 million in Stay Bonuses would not be payable at once but divided and staggered over a number of months.

## The Debtors' Need for the Retention Program

185.    It is necessary to ensure the continued employment and services of each of the Key Personnel during the Debtors' efforts to transition to and conduct an orderly liquidation

of their assets. Generally, the employees identified by the Debtors as Key Personnel have substantial experience and knowledge regarding the Debtors' businesses, integral to the Debtors' chapter 11 cases and the liquidation process, and/or will provide valuable services, including (i) store support and transition services through inventory management, vendor communications, and sale and merchandising management; (ii) handling of customer orders and service issues (*e.g.*, attempting to fill partial customer orders and prevent cancellations); (iii) handling of press releases and acting as media contacts; (iv) lease management services; (v) warehouse and delivery supervision and related services; (vi) customer support and after-delivery services; (vii) human resources and personnel termination management and services; (viii) cash management, payroll, collections management, union and financial reporting, and related services; (ix) information systems and telecommunications management and support; and (x) certain necessary facility and administrative support services. Further, because of the chapter 11 filings and wind-down process, many of these employees will have increased workloads and all will have to perform services under difficult circumstances. The Debtors are deeply concerned that the uncertainty precipitated by the commencement of their chapter 11 cases and the expedited nature of the (anticipated) GOB sales may result in the departure of a significant number of key individuals at a time when their services are essential. A loss of Key Personnel would have a direct and serious negative impact upon the Debtors' operations, and delay and interfere with the GOB sales and other wind-down operations, thereby substantially harming the estates. In many cases, the Debtors would have no ready replacement for these individuals who may choose to leave at will, and in other cases, the Debtors may possibly be able to find replacements but that process would consume valuable, and scarce, time and resources.

186.    As discussed above, the Debtors estimate that the total cost of the
Retention Program will be approximately $1.15 million, assuming that all potential retention
bonuses are awarded.16  The payments contemplated under the Retention Program will not
prejudice stakeholders; indeed, for the reasons discussed above, implementation of the Retention
Program will facilitate the Debtors in maximizing the value of their assets in the liquidation
process, redounding to stakeholders.  In addition, in order to receive the Stay Bonuses, eligible
employees will be required to, among other things, waive any and all other retention, severance
or termination benefits that may be payable under their employment contracts, pursuant to
prepetition policies, or otherwise.  Further, the Lender Group supports the payments
contemplated under the Retention Program.

187.    Based on the foregoing, the Debtors believe that immediate
implementation of the Retention Program is crucial to entice the Key Personnel to remain with
the Debtors through their expedited liquidation and bankruptcy process.  Without such a program
in place, it is likely that a significant number of these individuals will promptly leave the
Debtors' employ, so as to seek financial security for themselves and their families, to the
detriment of the Debtors, the estates, and their creditors.

---

16 As discussed above, if the Debtors subsequently determine that a particular eligible employee's services is
needed for a longer period than currently expected and said employee continues to provide services for the extended
period and meets the other requirements described above, the applicable employee will receive a Stay Bonus greater
than currently projected.  However, the Debtors do not anticipate subsequent extensions of service to be significant
in the aggregate, and accordingly, believe that the total cost estimate is as accurate as possible under the
circumstances.  In the event that circumstances subsequently develop causing the Debtors to believe that the total
payout under the Retention Program will exceed $1.15 million, the Debtors will provide notice thereof to the U.S.
Trustee, the Lenders and any statutory committee that may be appointed in these cases.

I swear under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Dated: July 13, 2004

G. Joseph Reddington